UNITED STATES *v.* YOUNG.[1]

*(District Court, E. D. North Carolina.  Fall Term, 1885.)*

CRIMINAL LAW—INSANITY AS A DEFENSE—TEST OF ACCOUNTABILITY—KNOWLEDGE OF RIGHT AND WRONG.

The legal test of the accountability of a criminal for his acts is his mental ability, at the time of the commission of the crime, to discriminate between right and wrong, with respect to the offense charged in the indictment.

Motion for New Trial.

*F. H. Busbee,* U. S. Dist. Atty., for the United States.

*Moore & Clark,* for defendant.

SEYMOUR, J.  The defendant, a postmaster in this district, has been convicted under section 4053 of the Revised Statutes of embezzlement of government money.  His defense upon his trial was based upon alleged insanity, and, as this was not established by evidence, the jury properly found a verdict of guilty.  The testimony offered merely showed eccentricity.  "There are many persons who, without being insane, exhibit peculiarities of thought, feeling, and character which render them unlike ordinary beings, and make them objects of remark among their fellows.  They may or may not become actually insane, but they spring from families in which insanity or other nervous diseases exist."  See Mauds. Resp. 40.  The defendant would seem, from his neighbors' testimony, to belong to the class of persons so described by Dr. Maudsley.

This is a motion for a new trial, based upon the testimony of two physicians who have examined the prisoner since his conviction.  Were the case any other than one of alleged insanity the motion would be denied upon the preliminary ground that the evidence was not newly discovered.  There is no reason why the examination should not have been made before the trial; more especially, as the defense of insanity was made at the spring term of this court.  I am not disposed, however, to put the denial of the motion on the ground of laches.  If the defendant ought not to be punished for his admitted violation of the law, he surely ought not for failure to introduce his evidence in due time.

---

[1] See note at end of case.

I proceed, then, to consider the expert testimony. The highly respectable medical gentlemen who have examined the defendant, both expressed the opinion that Jones Young was of disordered mind: one of them held that while capable of distinguishing between right and wrong with regard to his alleged crime, yet that he was irresponsible; the other, that he was only partially responsible. The great regard that I have for the opinion of the witnesses renders it proper for me in differing from them, or one of them, upon one point to give my reasons for doing so. I am compelled to hold, upon their evidence, that the defendant is responsible as matter of law. Both by the rules laid down by courts, and by the opinion of medical writers on this branch of jurisprudence, mental unsoundness does not necessarily bring with it irresponsibility. There is a class of criminals "marked by defective physical and mental organization, one result of their defect being an extreme deficiency, or complete absence, of the moral sense. A considerable portion of them spring from families in which insanity, epilepsy, or some other neurosis exists. Crime is a sort of outlet in which their unsound tendencies are discharged. They would go mad if they were not criminals, and they do not go mad because they are." See Mauds. Resp. 32. They are on the border land between insanity and crime. In meeting the delicate question of responsibility for wrong, our difficulty is not solved when we determine that a defendant is of weak mind and defective moral sense. "Nature makes no leaps," and between the most powerful intellect and idiocy or imbecility there is a continuous, unbroken, imperceptible descent. On both sides of an invisible line are multitudes of cases where it is impossible to say with confidence that the mind is or is not sane; but when the question of responsibility is presented to a court, there is an imperative necessity of deciding, and there is further a necessity of deciding by rule. An arbitrary line, if none other can be discovered, must be drawn. It must be so drawn as to be certain, comprehensible, and broad; certain enough to be a basis for the conduct of life; comprehensible enough to admit of its being explained clearly to a jury of plain men without danger of their being misled; broad enough to cover many cases without confusing unskilled minds by minute distinctions. The refinements of scientific classification must be pretermitted. The first necessity in the administration of justice must be considered, and that is the safety of the community,—the protection of the greater and more valuable class in it who are not insane. A rule must be laid down which will not have the effect of letting many criminals escape through the bewilderment of juries. Tenderness to the weak, commendable as it is, must not be stretched so as to endanger the lives or even the property of the public. In looking for such a rule courts have always had in view, as the true end of punishment, the prevention of crime. In dealing with the criminal insane, as in dealing with the class which stands on the border line of insanity, the irreclaimably vicious, the object of the law in

imposing sentences is neither to punish nor to reform; the former is useless, the latter impossible. The only end aimed at is to deter by the fear of punishment. In theory, then, it would be correct to say that a person of unsound mind should be punished for such acts as the fear of punishment might prevent, or tend to prevent. Experience abundantly shows that such fear does act as a restraint upon the insane; but some more definite instruction must be given to a jury. The rule adopted by the courts, after long discussion, and in modern times, is the famous "knowledge of right and wrong" test. As laid down by the English judges in answer to questions propounded to them by the house of lords, in 1843, it was stated in the following terms:

"To establish a defense on the ground of insanity, it must be clearly proved that, at the time of committing the act, the accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong."

The rule was clearly laid down in North Carolina by GREEN, J., in a case tried in this city, (*State* v. *Haywood*, Phil. Law,) in 1867, in these words:

"If the prisoner, at the time he committed the homicide, was in a state to comprehend his relations to other persons, the nature of the act and its criminal character, or, in other words, if he was conscious of doing wrong at the time of committing the homicide, he is responsible. But if, on the contrary, the prisoner was under the visitation of God, and could not distinguish between good and evil, and did not know what he did, he is not guilty of any offense against the law, for guilt arises from the mind and wicked will."

This instruction was approved by the late chief justice, and is law in North Carolina, as it is in most of our state and federal courts. The deviations that have been made from it have not been systematic, have introduced no new rule, and have been merely productive of confusion. So well-established a principle ought not to be changed otherwise than by legislation. I certainly do not feel at liberty to depart from it.

The right and wrong test has been attacked by medical writers with great vehemence, and sometimes with intemperance. It has been treated often as an attempt to state a rule which should test sanity. Very few enlightened lawyers would, in 1843, have denied the possibility of the existence of cases where the rule would fail even as a test of moral responsibility. I do not doubt but that a man may be mad without delusion, or may be driven to a desperate and homicidal act by morbid impulse. But such cases in which physicians have considered a defendant wholly irresponsible are rare; few of them, comparatively, are given even in books, written by those who have access to the statistics of innumerable cases of insanity. The legal view does not deny the possibility of affective insanity, but holds it unsafe to make it a legal defense. If such cases could be tested in any way, perhaps some other rule than the one now acted upon

might be given. But when we call to mind the extent of country, much of it not very well settled, which our law protects; the rareness of real experts; the danger of crude yet positive opinions, confidently though ignorantly pressed upon bewildered juries,—we may well appreciate that public alarm, which, after McNaughton's acquittal, induced the house of lords to ask the opinion of the English judges on the law of insanity. The expert who testifies to the discovery of poison in human remains can actually produce its metallic basis in presence of the jury. But insanity is a defect or a disease of the organ that thinks, the brain. *That* can as yet, be tested by no analysis, seen while life exists by no lens, measured by no instrument. The molecular change which accompanies thought ceases at death, and we but guess at the physical functions of the brain.

Conceding that the rule, as it exists, is defective, its liability to operate unjustly in exceptional cases does not often result in injustice. The prisoner is tried by a jury of his neighbors and has the benefit of the public opinion of the community, which rarely fails to be correct on the question of whether one accused of crime ought to be punished. In those cases in which that fails, as it sometimes does by reason of local feeling, there is the power of pardon vested in the executive,—a power more often abused by excess of mercy than of severity. If all these safeguards fail, there remains the case, which must sometimes occur in communities of men, of an individual compelled to suffer because, by the defect of human skill, he could not be protected without public injury. The instances of the punishment of men irresponsible through insanity in modern times, even allowing all the cases claimed as such by medical writers, do not equal in number the failures of justice through false testimony or false inferences from circumstances. With the most earnest desire to do exact justice, our courts must always occasionally fail because judge, jury, and witnesses are men, and subject to the limits of human nature.

But this would be no reason for an adherence to the present rule were a sounder and safer one discovered. Medical writers have suggested none. The alternative, which would seem to be the outcome of its objections to the right and wrong test, would be to allow the medical experts summoned as witnesses to give their opinions upon the question of the defendant's responsibility, and instruct the jury to decide upon the weight of medical authority.

Manifold, and apparently fatal, objections exist to this: (1) It would be contrary to the course of law, and a practical substitution of a tribunal unknown to our system for trial by jury. As Lord CAMPBELL remarked, to allow a witness to give his opinion as to the responsibility of the accused would be to leave to him the precise question which the jury is impaneled to decide. (2) Expert witnesses are employed by parties to the litigation. Thus they are selected not with a view to the discovery of the truth, but to serve a particular side. The medical men most likely to be favorable to the cause of

the defendant are naturally selected by him. The prosecution as naturally selects its experts upon similar grounds. And without imputing anything worse than ordinary and excusable human infirmity, interest, preconceived ideas, partisanship, and the desire for victory are liable to bias expert testimony. (3) The physician sees the subject of insanity from the standpoint of doctor and patient, instead of from that of society and violator of law. (4) A specialist is not always a safe witness for the very reason that makes him a specialist. It is reasonable to expect a man who had made a special study of poisoning by arsenic to sometimes see symptoms of arsenic poisoning when they do not exist. (5) But the great practical difficulty would be that, in a majority of cases, genuine expert testimony could not be obtained, for the reason that our criminal courts are held in hundreds of localities, in each of half a hundred states, in places remote from cities and learned men. Resting under these conditions, courts are compelled to adhere to the rule adopted by them in the past, not with any blind reverence for it as a thing decided, but because science has as yet provided them with nothing better.

But I do not consider the present case as one of which from any point of view irresponsibility could be predicated. There can be no doubt but that Jones Young knew that he was doing wrong in committing the acts which led to his conviction. His case is not one of irresistible impulse, for his embezzlement of government funds was the result of years of criminal conduct. His disease is not general mania. On the contrary, both of the doctors say that he was only occasionally insane. In cases of crime from what is called a morbid, irresistible impulse the criminal act of the patient is the evidence of his insanity. In this case the acts of the defendant are the best evidence of his responsibility. During a period of many years he has been guilty of systematic fraud. His quarterly returns rendered to the post-office department, and sworn to, each quarter have been regularly false. The amount of overcharges have been each time about the same, and yet have each time varied. It is impossible to suppose uniform conduct covering a series of years to be the result of an insanity consisting of an occasional incapability of appreciating obligations when in a "state of depression." The prisoner's conduct has been that of an adroit criminal. The doctors both say that he may have known right and wrong as to the acts with which he is charged. One of them believes him only partially responsible. The other says:

"He is irresponsible from a disordered brain from conducting himself as a sane person should, and that with, possibly, not an absolute ignorance of right and wrong he is, when his brain is in a state of depression, unable to do right or to resist wrong. His reason is in abeyance or perverted. He seems to be *non compos mentis*, and has mismanaged his public as his private affairs."

The reasons given by the expert witnesses for their opinions are: eccentric actions; mental peculiarities exhibited in conversation; ex-

cessive anxiety with regard to health; apparent lack of interest in his position; and particularly the existence of insanity in the family of defendant. All these facts are consistent with sanity, and the latter of them may explain all the rest. But if the defendant be of unsound mind he is yet responsible, unless insanity is in itself, in every case, a defense for any act committed by the insane person, both in his periods of insanity and in what are termed his lucid intervals. The sentence of the court, which is of two years' imprisonment at hard labor, is very much below the maximum and fits a case of guilt extenuated by the existence of a low moral sense.

If, upon the arrival of the defendant at the penitentiary, he shall be or become, in the opinion of the physician in charge, insane, he may, under section 4852 of the Revised Statutes, be confined in the government hospital for the insane, and be cared for as an insane man; and this result will, in such event, be obtained without the ill consequence which would flow from giving unnecessary weight to a defense so dangerous in a case of systematic, ingenious, and long-continued fraud, as that of insanity. The motion for a new trial is denied.

### NOTE.

#### *Insanity as a Defense—Knowledge of Right and Wrong.*

For a full discussion of the subject of insanity as a defense, see Guiteau's Case, 10 Fed. Rep. 161, and notes by Dr. Wharton and Robert Desty, 189–204.

Insanity cannot be proven by reputation. Walker v. State, (Ind.) 1 N. E. Rep. 856. The supreme court of Nebraska say, in the case of State v. Priebnow, 16 N. W. Rep. 907, that "the better rule, we think, and the one adopted by this court in Wright v. People, 4 Neb. 407, is, in effect, that if one accused of crime have the mental capacity to distinguish right from wrong, *in respect to the particular act charged,* he is responsible; and the converse of this proposition would also be true." See Hawe v. State, (Neb.) 10 N. W. Rep. 452. It was held by the supreme court of Iowa, in State v. Jones, 17 N. W. Rep. 911, S. C. 20 N. W. Rep. 470, that an instruction in a trial in a case of homicide, where insanity is set up as a defense, which tends to confine the attention of the jury to the appearance, conduct, and language of the defendant at the time of the killing, and excludes testimony as to insanity at other times, is erroneous. It was declared by the supreme court of Kansas, in State v. Nixon, 4 Pac. Rep. 159, that "where a person, at the time of the commission of an alleged crime, has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong, he is generally responsible, if he commits such act or acts, whatever may be his capacity in other particulars. But if he does not possess this degree of capacity, then he is not so responsible." It was said by the supreme court of Oregon, in State v. Murray, 5 Pac. Rep. 55, that "if the prisoner knew enough to know he was violating the law by the commission of the act, the delusion will not excuse him, although he had surrendered his judgment to some mad passion, which, for the time being, was exercising a strong influence over his conduct." The court in this case say that "when the commission of the act charged as a crime is proven, and the defense sought to be established is **the insanity** of the defendant, the same must be proved beyond a reasonable doubt."

*St. Paul, Minn.* **JAMES M. KERR.**