ᴏOBORN, Plaintiff in error, vs. Tᴙᴇ Sᴛᴀᴛᴇ, Defendant in error.

*April 20—October 4, 1910.*

·Cʀɪᴍɪɴᴀʟ Lᴀᴡ ᴀɴᴅ Pʀᴀᴄᴛɪᴄᴇ. ·(1–9) *Waiver of irregularities and of constitutional rights: Jury trial: Change of venue: Former jeopardy: Discharge of jury.* (10) *Evidence: Opinions: Form of hypothetical questions.* (11–15) *Witnesses: Competency: Right to meet witnesses face to face: Wife as witness: Effect of divorce.* (16–20, 22, 23, 26) *Insanity: Evidence: Competency: What is legal "insanity:" Epilepsy.* (21, 25) *Instructions to jury.* (24) *Homicide.* (27, 28) *Jury: Isolation.* (29) *Appeal: Error: Prejudice not presumed.*

1. The constitutional guaranty of trial by jury and the statute as well entitle one, charged with having committed a criminal offense, to a trial by a jury of twelve men selected according to law, from the county where the crime is claimed to have been committed, and to have all issues, including that of insanity, tried in such county and by the one jury.

2. The right to a change of venue in a criminal case, depends upon statute and can only be claimed in the manner and upon the ground provided.

3. The rule that the right to a change of venue in a criminal case is purely statutory, does not exclude the idea that a change by consent is proper.

4. An accused person in a criminal case is competent to waive irregularities and rights, whether constitutional or statutory, very much the same as a party may in a civil action.

5. One accused of crime is competent to waive any irregularity or right, constitutional or statutory, except in a capital case the right of trial by a jury of twelve men, and that extends to waiver of the right of trial by a jury of twelve men competent to act as jurors.

6. The right to a jury trial and that to a trial in the county of the offense and the one to have all the issues tried before a single jury, are subject to waiver by the accused.

7. If one is put in jeopardy as regards a criminal charge, the jeopardy is subject to supersession where the ends of justice require the jury to be discharged and another jury to be impaneled to try the case.

8. In case the trial judge, in the progress of a trial, because of any emergency, concludes that it is imperatively necessary for him to suspend the trial indefinitely, and especially if counsel for

the accused concurs in that view without protest by the accused brought to the attention of the court, and in such situation the jury is discharged, leaving the trial to be taken up again before another jury, the jeopardy created by the partial trial is thereby wholly superseded.

9. In case of an accused person, after having been put in jeopardy, taking or consenting to any proceeding rendering necessary a new or additional trial in order to fully conclude the case, he cannot in such further trial successfully claim immunity on the ground of former jeopardy created by the first proceeding.

10. Counsel who calls a witness to testify within the field of opinion evidence, may frame his question upon such hypothesis as he thinks is reasonably warranted by the evidence, aiming to reasonably cover an entire situation, so warranted, subject to the opinion of the court as to competency.

11. On the question of competency, the interrogatory to the expert is not to be condemned because not warranted from the viewpoint of adverse counsel, since each party may take and have presented to the jury any reasonable position, in the judgment of the court, by propounding to witnesses such party's own hypothesis, leaving the weight of the answer to the jury and to turn, in part at least, on whether such hypothesis presents the true state of the case.

12. The decision of the trial court on the question of competency, is not to be disturbed on appeal unless it not only appears clearly wrong but that, had the error not occurred, the result of the trial might, within reasonable probabilities, have been materially more favorable to the complaining party.

13. The constitutional guaranty of the right of the accused person in a criminal prosecution to meet the witnesses face to face, does not extend to mere official authenticators of official documents offered in evidence on the subject of competency of a person produced as a witness to testify.

14. A judgment of divorce, so far as *in rem*, is conclusive on the whole world as to the status of the parties being, from that time, single as to each other, but does not settle the status of their prior relations so as to render them, as to the whole world, valid regardless of whether they were so in fact or not.

15. The rule precluding a husband or wife from being a witness for or against each other, or from disclosing confidential communications, contemplates the existence of a valid marriage.

16. Whether evidence of conduct of a person after the fact, in a criminal prosecution, is admissible on the question of whether such person was legally sane at the time of such fact, depends upon whether such conduct bears such relation to such person's former condition of mind as, in reason, to be worthy of consideration in respect thereto.

17. If the question of fact last suggested is decided in favor of admissibility, then the, rather miscalled, discretionary power, which is, really under the circumstances, power to judge as to the fact, is exhausted and there is no discretion as to whether to allow or not to allow the evidence; it is admissible as matter of right.

18. The term "insanity," in the law, means such an abnormal condition of the mind, from any cause, as to render the afflicted one incapable of distinguishing between right and wrong in the given instance and so rendering him unconscious of the punishable character of his act.

19. A person is not immune from punishment for a wrongful act if he has, at the time of perpetrating it, capacity to distinguish between right and wrong in respect thereto,—if he has such capacity and is conscious of the wrongfulness of his conduct.

20. The law does not recognize a form of insanity in which there exists capacity to distinguish between right and wrong and consciousness of the wrongful nature of the particular act, without power to abstain from it; i. e. in law he who can distinguish between right and wrong must, at his peril, choose rightly between them.

21. If the court instructs the jury in a criminal case that they should acquit the defendant unless they become satisfied by the evidence beyond every reasonable doubt that he is guilty, that sufficiently informs them that each juror should pass his own judgment on the evidence and not agree with his fellows to a conviction unless he is convinced, with the certainty mentioned, that the accused is guilty.

22. Proof of epilepsy does not, necessarily, directly establish insanity, as epilepsy is not, as a matter of fact or law, insanity, though evidence of an epileptic condition may bear, circumstantially, on the mental condition of the afflicted person to the extent of establishing insanity.

23. Whether the accused, in any given case, was afflicted with epilepsy, and if so whether the affliction was a mental disease or had impaired his mind, and if so whether sufficiently to render him unable to appreciate between right and wrong, are matters of fact to be established by evidence.

24. If one points a loaded gun and discharges it in a direction other than at a person who is in fact killed by the bullet reaching his person, glancing from another object, that one is yet guilty of a homicidal offense, if he knew, or ought reasonably to have known, that his conduct was dangerous to human life and yet he acted regardless thereof.

25. It is not improper to say, according to the facts, in instructing a jury, that experts have given their opinions as to the sanity of

the accused, leaving it to the jury to find the truth of the matter without being necessarily bound by the opinion evidence.

26. After a decision against the accused on a special issue as to insanity, evidence of his mental condition is only admissible on the general issue as bearing on the grade of the offense.

27. It is improper, in the trial of a capital case, to allow communications, verbal or written, between jurors and outside parties, unless strictly necessary and with knowledge of counsel on both sides.

28. Careful isolation of the jury, in a capital case, from all outside influence, so as to avoid any suspicion of the result being characterized by any improper influence, is advised.

29. Prejudice to a complaining party on appeal is not presumed from mere occurrence of error. The error cannot be regarded as harmful, so as to require a reversal unless, within reasonable probabilities, had the error not occurred the result might have been materially more favorable to the one complaining of it.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Affirmed.*

The plaintiff in error was informed against as having, on the 19th day of May, 1908, at the town of Amberg in Marinette county, Wisconsin, feloniously and with premeditated design, killed one Louis Tobaltz. Such proceedings were duly had that he was placed on trial on a plea of not guilty and a special plea of insanity. A verdict was duly rendered on the special issue in favor of the state. Before there was opportunity to proceed with the trial on the general issue, the circuit judge was constrained to believe it was necessary for him to suspend the trial and discharge the jury because of the serious illness of his wife at the family home in Oshkosh, Winnebago county. Counsel on both sides recognizing that such emergency existed, entered into a stipulation, as follows:

"It is hereby expressly stipulated that the jury now impaneled which has tried the issue of insanity and now is in the custody of the officer shall be discharged from further consideration of the case, that the place of trial and venue of the action be changed from Marinette county to Winnebago county, Wisconsin, the defendant expressly requesting such

change and waiving any irregularity in not proceeding with
the issue of not guilty at this time and place, reserving how-
ever the right to move the court to set aside the verdict and
grant a new trial upon the insanity issue heretofore tried in
this county and at this term, that the argument on said matter
be taken up before the Hon. GEO. W. BURNELL, the presiding
judge, at such time and place as he may direct. Further
stipulated that the state may have the privilege of introducing
the testimony of such witnesses as given upon the trial of the
insanity plea as they may see fit, subject to the objections
entered and the objections as to its competency, relevancy,
and materiality, that the cause may be placed on the calendar
of the present September term of the circuit court of Winne-
bago county and brought to trial at such term on the 14th
day of December, 1908, at 2 p. m. That a jury be sum-
moned upon a special venire for the trial of said cause. And
the court to fix a time for hearing the argument on the motion
to set aside the verdict rendered on the insanity plea and
granting a new trial, which motion is to be heard before the
Hon. GEO. W. BURNELL, the presiding judge at this trial at
Oshkosh, Winnebago county, Wisconsin, upon notice by the
court to both parties, which motion is to be passed upon and
argued before the 14th day of December, 1908."

Accordingly the jury were discharged, an order changing
the place of trial was entered, and, in due course, the cause
was brought on to be heard in Winnebago county. Where-
upon counsel for the accused moved the court for an order set-
ting aside the verdict on the special issue and for a new trial
thereof, assigning various reasons, all of which related to
error claimed to have been committed on the former trial.
No point was made, at first, to the effect that the discharge of
the jury in Marinette county opened up the special issue for
a retrial. All grounds for the motion were upon the theory
that the verdict was to be treated the same as if the whole case
had been tried in Marinette county and a motion made there
for an order vacating the result and granting a new trial be-
cause of errors committed on the trial of the special issue.
The motion was denied. Thereupon the accused, by his at-

torney, consented to further submit to the jurisdiction of the
court only upon condition of the whole case being regarded as
open for trial the same as if nothing had occurred in Mari-
nette county regarding the special issue.    The court adhered
to the opinion that the trial in Marinette county was conclu-
sive as to the special issue, leaving only the general issue of
not guilty to be tried on the change of venue, the same as if
the trial of such issue had been proceeded with in Marinette
county after the verdict on the special issue.    Thereafter a
plea of former jeopardy was interposed, the claim being that
the jeopardy created by the proceedings in Marinette county
had not been conclusively waived or superseded; that the
consent to discharge the first jury was upon the theory that
the one to be impaneled in Winnebago county would take the
case where the first jury did, not where it left off; that such
was the effect of the written agreement; and that, by the court
refusing to so administer it, defendant was entitled to effi-
ciently claim his constitutional right of immunity from being
again placed on trial.

The plea of former jeopardy was overruled.    Under pro-
test by the accused, that further proceedings were erroneous
and illegal because of a former jeopardy, as claimed in the
plea, he was, in due form, placed on trial upon the plea of not
guilty.

The evidence was to this effect: Prior to the date of the
alleged homicide, the accused with his child and a woman pur-
porting to be his wife, resided in the village of Amberg, Mari-
nette county, Wisconsin.    He did not live happily with the
woman.    He was quite jealous of her because, among other
things, of her supposed improper relations with Louis Tobaltz.
On the evening before the homicide he locked the door of his
house against her so she could not gain entrance thereto upon
her return after an absence of some less than an hour.    The
next morning she entered the house through a door left un-

locked by a boarder upon his leaving for his day's duties.
A short time thereafter, the accused, taking his rifle and re-
volver, coerced her to precede him to the working place of
Tobaltz. Such place being closed the journey was continued
to the place where Tobaltz resided. She then, at the defend-
ant's command, rapped at the door. Thereupon Tobaltz ap-
peared, but upon observing the accused with gun in hand he
attempted to retreat into the house, and close the door before
him and the accused. At that instant the accused pointed
and discharged his rifle in the direction of Tobaltz, whose po-
sition was such that the shot passed through the door and
struck the latter, severing the main artery of one arm, from
the effect of which he died in a short time. As the fatal
wound was inflicted, the door swung inward and Tobaltz
staggered backward, exclaiming, "I am shot," the accused
exclaiming in reply, "Yes, come out here and I will shoot you
again." Immediately, or soon, thereafter, he used harsh
language toward the woman and expressions indicating that
he was in a frame of mind to shoot her. Later he claimed
his conduct was caused by improper relations between her
and Tobaltz, confessed by her to him on the morning after
her aforesaid absence from the house, and preceding his start-
ing out to meet Tobaltz.

On the insanity issue there was much evidence tending to
show that the accused was afflicted with epilepsy, the claim
being that it, and other derangements, had affected his mind
so as to render him irresponsible for the homicide.

The court on the main issue, among other things, informed
the jury of the result of the trial of the special issue and that
such result settled the question of whether the accused was
insane at the time of the shooting, against him, but that evi-
dence of impairment of his mind, not amounting to legal in-
sanity, was to be considered on the question of whether, if the
accused was guilty of having committed a criminal homicide,

it was characterized by the element of premeditated design to effect the death of Tobaltz, essential to the full offense charged; that of murder in the first degree.

The trial resulted in a verdict of murder in the second degree and judgment was duly pronounced.

The points saved for consideration on review by this court and so presented as to require consideration, so far as they seem to have sufficient warrant to require special discussion and decision, will be treated in their order.

*W. B. Quinlan,* attorney, and *Daniel H. Grady,* of counsel, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, A. C. Titus,* assistant attorney general, and *John O. Miller,* of counsel, and oral argument by *Mr. Miller* and *Mr. Titus.*

The following opinion was filed May 24, 1910:

MARSHALL, J.    The constitution (sec. 5, art. I) guaranteed the inviolability of the existing right of trial by jury; that is, that it should continue as before the formation of the constitution. So the fundamental law contemplates a trial of all the issues in a criminal case before an impartial jury of twelve men, selected in the manner provided by law from the vicinage where the crime was committed; that is of the previously ascertained jurisdiction within which the offense occurred. In harmony with that, sec. 7, art. I, of the constitution provides that "in all criminal prosecutions the accused shall enjoy the right to . . . a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law." In harmony with both these constitutional provisions, the statutes regulating the trial of criminal causes where the defense of insanity is interposed, provide for a trial of such issue and the general

issue of not guilty as well before a single jury. Secs. 4679, 4697, Stats. (1898).

That defendant has, as indicated, a constitutional right to have all the issues in his case, including any special issue of fact, particularly as to his sanity, tried before a single common-law jury of twelve impartial men of the county where the crime shall have been committed,—has always been recognized in the jurisprudence of this state. *Gaston v. Babcock,* 6 Wis. 503; *Bennett v. State,* 57 Wis. 69, 14 N. W. 912; *Schissler v. State,* 122 Wis. 365, 99 N. W. 593. It follows that the trial in this case of the special issue in Marinette county before one jury and of the general issue of not guilty in Winnebago county before a second jury, was illegal, as claimed by counsel for the accused, unless he could and did waive his constitutional right to have the whole case submitted to one jury in one county.

The constitution makes no provision for a change of venue in a criminal case, so any such change must be referable to some statute which is in harmony with the guaranteed right, unless such right may be waived. *French v. State,* 93 Wis. 325, 67 N. W. 706. The Statutes, at sec. 4680 (Stats. 1898), provide for a change of venue in specified circumstances upon application of the accused. That contemplates competency to waive the constitutional right by invoking the statutory privilege to a change and has been held valid on the ground of such competency in fact existing. The idea is that the trial must be held in the county where the crime shall have been committed, unless changed upon application of the defendant (*Wheeler v. State,* 24 Wis. 52; *Bennett v. State,* 57 Wis. 69, 75, 14 N. W. 912), and as the right to a change is purely statutory, unless it is invoked upon the terms and in the manner provided by the statute, it does not exist at all. *French v. State, supra.*

It must be observed that the decisions referred to deal,

mainly, with constitutional and statutory rights, so when it is said that the "right to a change of venue depends entirely upon the statute" and "can be had only" as the statute provides, that means can be had only as a matter of right, not that it cannot occur by consent, the accused waiving his right.

As indicated, the very idea of the statute contemplates a constitutional privilege of an accused person to waive his right of trial in the particular county. It must not be lost sight of that the statute respecting a change is valid only on that ground. *Bennett v. State, supra.*

So it follows that it was competent for the accused, in this case, to bind himself by a waiver of the right to a full trial, or any trial, in Marinette county, unless the statutory provisions contemplate a waiver in a particular way and upon particular grounds, excluding all others, creating a disability, if none existed, otherwise, to make a binding waiver upon other grounds and in other ways. It goes without saying that the statute makes no provision for a change of venue in a criminal case for the reason or in the manner the one occurred in this case. Does the constitutional guaranty, or the statute, or both, create a disability in that regard? Those questions are now involved.

The circuit courts of this state are courts, under the constitution, of very extensive jurisdiction. Each is a court for the whole state, restricted, however, somewhat in its activities as to taking jurisdiction *in invitum,* but not by consent. The circuit court for Winnebago county had jurisdiction of such subjects as that involved in this case, and must be held to have had jurisdiction of the subject matter of the particular cause of action, if it came to the court in a permissible way. The question of competency of the accused to waive his right to be tried before a single jury, and his competency to waive his right, as it is claimed he did, to a trial by such jury in Marinette county, may be treated together.

The doctrine of waiver, as applied to a criminal case, is a very broad one—quite as broad as in civil cases. It applies to constitutional as well as statutory rights. *Emery v. State,* 101 Wis. 627, 645, 78 N. W. 745; *Lowe v. State,* 118 Wis. 641, 96 N. W. 417; *Stoddard v. State,* 132 Wis. 520, 112 N. W. 453; *Hack v. State,* 141 Wis. 346, 124 N. W. 493.

An examination of the cited cases will show that no limit has yet been found in this court to the competency of an accused person in a criminal case to waive irregularities or rights, except the single instance, one of disability, in a capital case to waive the right of trial by twelve jurors: *Jennings v. State,* 134 Wis. 307, 114 N. W. 492, following the early case of *State v. Lockwood,* 43 Wis. 403, decided before the doctrine of waiver had attained the recognition which it has in recent years. In the judgment of the writer, the exception mentioned would not be made now if the court were permitted to treat the matter from an original standpoint. In *Okershauser v. State,* 136 Wis. 111, 116 N. W. 769, it was said that the rule of *State v. Lockwood, supra,* should not be extended, and that was emphatically affirmed in *Hack v. State, supra.* The saying in *Emery v. State, supra,* that the trend is in favor of the doctrine that a party in a criminal case may waive irregularities and even rights very much the same as in a civil case, *Judicia posteriora sunt in lege fortiora,* has been many times significantly illustrated in recent years. Constitutional rights have been held waivable in common with mere irregularities. The instances are very numerous. The cases cited are a few of the many.

In *Bennett v. State,* 57 Wis. 69, 14 N. W. 912, it was held that a party in a criminal case, irrespective of any statutory authorization, and in addition thereto, may waive constitutional rights. In *In re Staff,* 63 Wis. 285, 23 N. W. 587, it was remarked that any right secured by sec. 7, art. I, of the constitution to an accused person may be waived by him

without authority of statute, as has often been judicially determined, except the right of a trial by jury. Many illustrations are given of sustained waivers of constitutional rights, among them waiver of the right to a trial in the county of the alleged offense and consent to a trial in a county hundreds of miles distant therefrom. Some regret seems to be there expressed because the court was not untrammeled, as was the court in Iowa, to recognize that competency to waive extended even to a jury trial, the court saying that, even in such field, the right is not so sacred but that it may be waived by legislative consent, thus holding that the question of whether an accused person, in such field, may be bound by waiver, is a matter of public policy rather than constitutional disability.

So it seems to follow, logically, that it was competent for the plaintiff in error to waive his right to a full trial in Marinette county and his right to a trial before a single jury as well; to waive all things done, out of the ordinary, resulting in his conviction, which it is claimed affected fatally such conviction. Whether the waivers occurred or not depends upon the meaning of the stipulation. There is no controversy but that the accused waived any further proceedings before the first jury after the verdict was rendered on the special issue, and waived any further trial in Marinette county, and all objections to the case being taken up for such further proceedings as might be necessary to conclude it in Winnebago county. Did he do so with the understanding that such further proceedings would, necessarily, include a retrial of the special issue before the second jury, or only in case of the verdict on the special issue, on motion made in Winnebago county, being set aside for error?

Looking solely to the stipulation for the change of venue, in connection with what was done under it, it seems that the understanding of all the parties, when they signed the agreement, was that the trial in Winnebago county would be taken

up before a second jury in the condition in which it was left when the verdict of the first jury on the special issue was recorded. The meaning of this language seems quite clear:

"The jury now impaneled which has tried the issue of insanity . . . shall be discharged" and "the place of trial and venue of the action shall be changed from Marinette county to Winnebago county, Wisconsin, the defendant expressly requesting such change and waiving any irregularity in *not proceeding with the issue of not guilty at this time and place, reserving however the right to move the court to set aside the verdict and grant a new trial upon the insanity issue. . . .*"

Other language as plainly suggested a new trial of the whole case only upon the verdict on the insanity issue being set aside for cause. Do not the words "in not proceeding with the issue of not guilty at this time and place" by necessary inference suggest that the next thing to be done in the case was the trial of that issue, subject to the reserved right to challenge in Winnebago county, for cause, the validity of the verdict rendered on the special issue, the same as it might have been in Marinette county before the stipulation was made? It seems so to us. Moreover, we should feel sure that the learned counsel for plaintiff in error so understood the stipulation, when the case was brought on for a hearing in Winnebago county, in the absence of his protest that he did not. No claim was at first made that the partial trial in Marinette county was superseded by the stipulation and what had occurred under it, so as to open up the case for trial in the whole. An ordinary motion was made, as might have been done in Marinette county before the jury there were discharged, for an order vacating the verdict for error. That motion treated the verdict already rendered, binding, so far as it went, unless the court should set it aside for some ground of error suggested.

Again, when the plea of former jeopardy was interposed, consent was incorporated therein to stand by the stipulation.

Oborn v. State, 143 Wis. 249.

There, for the first time, so far as the record shows, it appears that a claim was made that the stipulation secured to the accused a new trial of the special issue, regardless of whether fatal error was committed upon the first trial. The language does not suggest that the result of the first trial was necessarily superseded by the mere circumstance of the suspension of the proceedings till again taken up before another jury in another county. It suggests that there was a stipulation, not for leave to move for a new trial of the special issue, or merely reserving the right to so move, but for a new trial of such issue, and the court had lost jurisdiction by denying it, rendering the accused competent to plead the former partial trial as a jeopardy not waived, and so precluding a second jeopardy. The idea expressed in the plea, "the defendant now offers to submit to a trial of said special insanity plea under and pursuant to the stipulation," the trial court was unable to discover was in the stipulation, in letter or spirit, and we are likewise unable. The plea did not attempt to withdraw from the stipulation. It merely claimed for it, seemingly as a last resort, a meaning not found to be therein by the court nor by this court. If the learned counsel intended to incorporate such meaning in the paper, the words chosen to express it were most unfortunately selected.

It follows that the right of trial before a single jury of and in Marinette county, was not only effectually waived by the accused, but the jeopardy created by the partial trial in such county was waived by the consent to discharge of the first jury and conclusion of the trial before another jury in another county.

It is elementary that if, though an accused person once enters jeopardy, he consents, expressly or by necessary inference, to its being superseded, he may again be placed in jeopardy without any violation of his constitutional protection against being so placed twice. Moreover, it is quite elementary that after jeopardy has been entered it is subject to

necessary suspension without a formal verdict where the ends
of justice, under the circumstances, would otherwise be de-
feated if it was not competent to suspend the trial, discharge
the jury, and later impanel a second jury. *State v. Crane,*
4 Wis. 400; *Benedict v. State,* 14 Wis. 423; *Thompson v.
U. S.* 155 U. S. 271, 15 Sup. Ct. 73. In the federal case the
court held:

"Courts of justice are invested with authority to discharge
a jury from giving any verdict, whenever in their opinion,
taking all the circumstances into consideration, there is a
manifest necessity for the act, or the ends of justice would
otherwise be defeated, and to order a trial by another jury;
and that the defendant is not thereby twice put in jeop-
ardy. . . ."

Under the foregoing it is considered that upon the emer-
gency occurring, which in the judgment of the trial court and
counsel upon both sides rendered further proceeding with the
case for a considerable period of time practically impossible,
it was within the competency of the court to supersede the
jeopardy existing and discharge the jury, and certainly
within such competency, the accused consenting. So there
was no former jeopardy existing when the trial was called in
Winnebago county, interfering with the trial of the issue of
not guilty before the second jury. The accused was a party
to the agreement creating the conditions rendering it compe-
tent for the court to proceed with such trial. He was compe-
tent to bind himself to submit to the trial as it was had by
signing the stipulation after rendition of the verdict on the
special issue. He could not without permission of the court
have withdrawn from such stipulation. He made no attempt
to withdraw therefrom, but only claimed therefor a different
meaning than seems to have been incorporated therein.

We are unable to agree with counsel for plaintiff in error
that the evidence established insanity as a matter of law. We
are rather constrained to believe that the jury were well war-

ranted in reaching the conclusion that there was no reasonable doubt but that the accused was sane, in the legal sense, at the time of the homicide.      Therefore, the court properly refused to direct a verdict in favor of the accused on the special issue.

We are unable to discover any prejudicial ruling on objections to questions propounded to experts who testified upon the special issue.      It is suggested that the trial court ruled on such objections upon the theory that it was competent for a party calling an expert to propound to him and have answered hypothetical questions, omitting or including at pleasure matters covered by the evidence, leaving the weight of responses to abide the judgment of the jury under all the circumstances. Counsel gathered that idea because of the court having remarked in overruling an objection, "The counsel has framed his own hypothesis; he is not obliged to take the hypothesis of the other, and if there are any assumptions in the question which are not proven by the evidence, why to that extent it destroys the value of the answer."      True, the counsel calling an expert has a right to frame his own hypothesis, but just as true it should be one reasonably covering an entire supposed situation according to the evidence.      It should include, from a reasonable viewpoint, all elements disclosed by the evidence bearing on the precise point to which the expert's attention is directed.      But the viewpoint is that of the interrogator, not of the adversary attorney.      True, as the court said, whether the facts assumed for the purposes of the question are true in fact, is for the jury to determine, and in case of a determination adverse to the questioner, to that extent it destroys the value of the answer.      Really, we are unable to see the meaning in the court's language which counsel attributes to it. Rightly understood, we do not see any difficulty with it.      It means that the questioner had a right to state to the witness a hypothesis, reasonable from his viewpoint, subject to the judgment of the court, on the question of competency, as to whether it was reasonable from such point though it might ap-

pear not so from an adversary situation. It must be assumed, from aught appearing in the record, that, in testing questions objected to for competency, the court considered them with reference to whether they were justified by all the evidence and included, in a reasonable view of the case, all elements bearing on the precise subject of inquiry. That is all the rules require as this court has held. *Schissler v. State,* 122 Wis. 365, 373, 99 N. W. 593. In such field a trial judge has much latitude. The decision cannot properly be disturbed unless it is manifestly wrong and also prejudicial to the extent that if the error had not been committed the result of the trial might, within reasonable probabilities, have been different. This doctrine, as to rulings of trial courts on mere questions of competency, follows from the general rule that determinations of such courts on matters of fact are to be taken as verities unless manifestly wrong, and the rule of the Code that errors however numerous shall be regarded as inconsequential, unless it appears that they were in fact prejudicial, in that they may reasonably have led to a materially different result than otherwise would have occurred. These general observations sufficiently answer the assignments of error as to questions propounded to experts on either side. They have been examined in detail without discovering prejudicial error within the rules stated.

The reputed wife of the accused was called as a witness, and to show her competency the record of a divorce action in a court of competent jurisdiction, and authenticated so as to be admissible as evidence under ordinary circumstances, was offered and received for the purpose of showing that the purported marriage of the witness with the accused was within one year after he was divorced from a former wife and so was illegal under *Lanham v. Lanham,* 136 Wis. 360, 117 N. W. 787. It must be conceded that if the marriage occurred as suggested, it was invalid, but it is claimed that it was not competent to prove the record by certification, in that such

method violated the constitutional right of the accused to meet the witnesses face to face.

The witness sworn was the only one whose competency was legitimately in question. That witness defendant met face to face. The person upon whose act the requisite character of the certified copy depended, was not a witness against the accused in the constitutional sense. At most, he was a witness on the question of the competency of the purported wife to be a witness in the case. The question is rather new, but, logically, it seems that the constitutional right does not extend so far as to preclude the use of duly authenticated copies of public records on a criminal trial for the mere purpose of establishing, on the issue before the court of competency, the right of a witness to testify.

To meet the evidence as to the competency of Mrs. Oborn, so called, to testify, counsel for the accused offered in evidence the original record of a divorce action wherein, subsequent to the time of the purported marriage, she was divorced from him. Counsel contended that the judicial treatment of the relations between the parties at the time of such divorce judgment, as those of husband and wife, in effect, judicially established such to be their status, till changed by such judgment. The record, as the court remarked, negatived the fact that the parties entered into a marriage contract subsequent to the void marriage, because such void marriage was the one, according to the finding, the action was brought, and the judgment purported, to dissolve. It seems that the mere treatment of the parties as man and wife in the divorce action, and judicial dissolution of their purported relations, did not make the void marriage valid. It merely established the status of the parties toward each other as judicially separated and absolved from all obligations of a marital nature existing between them. The action was not to establish the status of the parties to be that of man and wife. Had that been the purpose of the action it would have been binding generally.

The action and the result, dissolving any existing marital relations between the parties, did not, as to the public generally, establish such relations to be such as the parties claimed for them. So far as the action was *in rem* the *res* was the condition of subsequent singleness as to each other, not valid prior existence of marital relations.

So it seems that upon all the evidence before the court on the question of competency, the witness never in fact became the wife of the accused and so was competent to testify when she was called for that purpose.

Complaint is made because the court excluded evidence of the appearance of the accused some time after the homicide and while he was confined in jail, during a period when he was afflicted, as said, with an epileptic disturbance. There is no doubt but that actions of a person, within reasonable limitations, after a homicide committed by him, as well as before, may be competent on the question of sanity. This court has distinctly so held. *French v. State,* 93 Wis. 325, 338, 67 N. W. 706. But as there said, evidence of such subsequent conduct is not necessarily admissible. Whether it is so, is within the field of competency, where, as before indicated, a wide range of judgment is permitted and error of judgment is regarded as inconsequential, unless it appears that it may probably have materially affected the result. In such a situation as that presented to the court here, the remoteness of time, the situation and surroundings, and many other things bearing on whether the incidents inquired about had such relation to the defendant's condition of mind at the time of the homicide, or such relation as to render the evidence of any real substantial probative force in any reasonable view of the case, all had to be considered. Such a matter, as said in *French v. State, supra,* is addressed "in the first instance, to the sound discretion of the trial court."

From the foregoing it is obvious that it must be, not only a case of plain error, but prejudicial error, not prejudicial in

the ancient sense of legal presumption of prejudice from the mere commission of error, but prejudicial as a fair inference of fact, to justify a court, upon review, in condemning a mistake in respect to rulings on the admission of evidence of acts of a person after the fact bearing on his mental condition at the time thereof, or even finding that mistake of any sort was made.    The alleged error in question falls well outside of that field.

The court was requested, on behalf of the accused, to instruct the jury to the effect that though the accused at the time of the homicide had sufficient mental capacity to enable him to know and appreciate the wrong of his act, yet he was legally insane, if by impaired will power, resulting from an abnormal condition, he was unable to resist the impulse to do the deed.    That was refused.    It was, as claimed, good law according to some authorities, particularly *Plake v. State,* 121 Ind. 433, 23 N. E. 273.    It is condemned, however, by numerous decisions in this state, notably *State v. Wilner,* 40 Wis. 304; *Bennett v. State,* 57 Wis. 69, 14 N. W. 912; *Butler v. State,* 102 Wis. 364, 366, 78 N. W. 590; *Eckert v. State,* 114 Wis. 160, 163, 89 N. W. 826; *Lowe v. State,* 118 Wis. 641, 660, 96 N. W. 417; *Schissler v. State,* 122 Wis. 365, 99 N. W. 593, though it must be admitted that in one of them, at least, language was used approving some such idea as at least not harmful error because of its liberality to the accused.    The test declared in those cases is the well-known knowledge of right and wrong test.

The term "insanity," as used in the special plea in a criminal case, means such abnormal mental condition, from any cause, as to render the accused at the time of committing the alleged criminal act, incapable of distinguishing between right and wrong and so unconscious at the time of the nature of the act which he is committing, and that commission of it will subject him to punishment.

True, as indicated, there are things in some of the cases

liable to lead to the belief that legal insanity may exist if, though the person be fully conscious of the wrong and its punishable character, he, because of a perverted mind, is. moved by an uncontrollable impulse. For instance, such theory was incorporated into the charge in *Butler v. State,*. *supra,* in connection with and as an addition to the statement that legal insanity means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong. That was approved, really, as not prejudicial, since it was the doctrine most favorable to the accused and one announced in a famous case referred to. We will say, however, that the instruction given in such case does not possess the dignity of having been approved by ultimate authority. Whether a refusal to give the element so said to be most favorable to the accused would have been regarded as fatal error, was not stated.

In *Lowe v. State, supra,* the giving of such so-called most favorable rule was held not error, to the prejudice of the accused, upon authority of *Butler v. State, supra; Eckert v. State, supra,* being also referred to. In that case complaint was made because the trial court in the charge preserved throughout, as the dominating feature, the idea that "if the defendant, at the time of the homicide, had sufficient mind to know right from wrong and understand the nature and quality of the act he was committing, then that he was sane in the law," and that was unqualifiedly approved as a correct statement of the law. True, it was said to be "fully justified by and that it in fact closely followed what was said in *Butler v. State.*" Consistency requires us to hold that it follows what was stated to be the rule rather than the most liberal rule. Whether the former or the latter was technically the correct rule, was not stated in *Butler v. State.*

That there is a wide distinction between the two rules seems plain. The so-called most liberal rule recognizes existence of

legal insanity notwithstanding capability to distinguish be-
tween right and wrong and consciousness of the wrongfulness
of the particular act.   The other does not.   This court in
*Eckert v. State, supra,* clearly reaffirmed the latter to be the
correct rule.   That is unmistakable because the court re-
ferred to the language of Chief Justice SHAW in *Comm. v.
Rogers,* 7 Met. 500, as having become the reliable classic on
the subject and incorporated into the text-books so as to be
recognized, generally, as elementary.   The following is the
language:

"A man is not to be excused from responsibility if he has
capacity and reason sufficient to enable him to distinguish
between right and wrong as to the particular act he is then
doing,—a knowledge and consciousness that the act he is
doing is wrong and criminal and will subject him to punish-
ment.   In order to be responsible, he must have sufficient
power of memory to recollect the relation in which he stands
to others, and in which others stand to him; that the act he
is doing is contrary to the plain dictates of justice and right,
injurious to others, and a violation of the dictates of duty.
On the contrary, although he may be laboring under partial
insanity, if he still understands the nature and character of
his act and its consequences; if he has a knowledge that it is
wrong and criminal, and a mental power sufficient to apply
that knowledge to his own case, and to know that, if he does
the act, he will do wrong and receive punishment,—such par-
tial insanity is not enough to exempt him from responsibility
for criminal acts."

Consistent with that view, in the more recent case of *Schiss-
ler v. State,* 122 Wis. 365, 99 N. W. 593, it was held that the
trial court did not unduly restrict the test of insanity by im-
pressing upon the jury the idea that the accused was legally
sane at the time he did the act if he was then capable of real-
izing the nature and quality of the act, or that the act was
wrong.   The following instructions were approved as the
correct statement of the law:

"The term 'insanity' as used in the special plea and issue
of insanity made by the defendant, means such perverted con-

dition of the mental and moral faculties as to render the person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing."

"If you find from the evidence that at the time of the alleged commission of the offense the defendant was suffering from mental aberration or sickness of mind produced by any cause, and by reason thereof his judgment, memory, and reason were so perverted that he did not realize the nature and quality of the act he was doing, or that he did not realize that it was wrong, you must find that he was insane, and for that reason not guilty."

It is not without interest in the historical review of the subject under discussion, that in neither of the later cases were the earlier ones of *State v. Wilner* (40 Wis. 304), decided in 1876, and *Bennett v. State* (57 Wis. 69, 14 N. W. 912), decided in 1883, referred to.    In both the consciousness of right and wrong test was regarded as the correct one.    In the latter case, except for other language in the charge considered, covering an additional unwarranted element, this was approved:

"If the evidence satisfies you that, at the time when he killed Dr. Hogle, the defendant was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing; . . . then you should find that he was insane."

That definite declaration of the correct rule is somewhat involved by a brief quotation, in discussing language condemned, from *Ortwein v. Comm.* 76 Pa. St. 414, 421.    The quotation, it should be remembered, was from that portion of the charge of the trial court respecting whether the accused was sufficiently sane to commit murder in the first degree, not whether he was wholly irresponsible.    The court said that one's criminal responsibility exists, to some extent, so long as his perception between right and wrong exists.

Thus it will be seen that one should not be misled into the belief, from the approval in *Butler v. State, supra* (102 Wis. 364, 78 N. W. 590), of a stated test of insanity as being a cor-

rect formulation of the most liberal rule, and that the giving of it cannot be efficiently complained of by an accused person, that such most liberal rule is the correct rule, or that it ought to be given in any case, or that the rule, eliminating the element which would dignify it as the most liberal, is not the correct one in fact.    This court is not committed to the doctrine that one can successfully claim immunity from punishment for his wrongful act, consciously committed with consciousness of its wrongful character, upon the ground that, through an abnormal mental condition, he did the act under an uncontrollable impulse rendering him legally insane. One, at his peril of punishment, commits an act while capable of distinguishing between right and wrong, and conscious of the nature of his act.    He is legally bound, in such circumstances, to exercise such self-control as to preclude his escaping altogether from the consequences of his act on the plea of insanity, though his condition may affect the grade of the offense.    Thus far the charity of the law goes and no farther. As said in *Flanagan v. People,* 52 N. Y. 467, as epitomized in the syllabus:

"The law does not recognize a form of insanity in which the capacity of distinguishing right from wrong exists without the power of choosing between them."

Many foreign judicial illustrations might be given supporting the foregoing stated doctrine of this court.    It is in harmony with the common law as indicated by a multitude of English decisions and all text-books.    It is denominated, for brevity, by some of the latter as the "right and wrong test." In *Bellingham's Case,* reported in Collinson on Lunacy, 650, Lord MANSFIELD charged the jury that "the single question for them to determine was whether [the accused] when he committed the offense charged upon him he had sufficient understanding to distinguish between good from evil, right from wrong; and that murder was a crime, not only against the law of God, but against the law of his country."

That test of power to distinguish between right and wrong, so formulated by Lord MANSFIELD, is in substantial harmony with English authorities as far back as 1706, at least, and is said to have ever since been followed in England "as the only one to mark the line between sanity and insanity, responsibility and irresponsibility." Lawson, Insanity as a Defense to Crime, 552.

In *M'Naghten's Case,* 10 Cl. & F. 200, which is a leading English authority at the present day, it was held that if the accused was conscious that the act was one which he ought not to do, and if the act was at the same time contrary to law he was punishable, he was legally sane. Lawson, Insanity as a Defense to Crime, 231. That has been adopted in the great majority of state and federal courts, while moral insanity, or irresistible impulse accompanied by consciousness of right and wrong doing, as legal insanity, has been recognized in but a very few jurisdictions, and in some of them not consistently. Those ideas are spoken of, rightly, as dangerous and as having taken hold most firmly in Kentucky.

In *U. S. v. Shults,* 6 McLean, 121, Fed. Cas. No. 16,286, the law was very tersely stated thus:

"If . . . defendant in violating the mail knew he was doing wrong and that he was liable to punishment for the act, he is a proper subject for punishment."

With like commendable brevity, it is said in *U. S. v. Young,* 25 Fed. 710, for a syllabus:

"The legal test of the accountability of a criminal for his acts is his mental ability, at the time of the commission of the crime, to discriminate between right and wrong, with respect to the offense charged."

That was referred to in the opinion as the "famous 'knowledge of right and wrong test' adopted by the court after long discussion and formulated by the House of Lords in 1843." *M'Naghten's Case,* before referred to.

In New York the same doctrine was adopted (*Willis v. People,* 32 N. Y. 715), though there were many attempts to engraft onto it modifications in accordance with the views of medical experts.    In *Freeman v. People,* 4 Denio, 9, and *Flanagan v. People,* 52 N. Y. 467, a like effort was made. It was answered by reaffirming the doctrine announced by TINDAL, C. J., in *M'Naghten's Case,* 10 Cl. & F. 200, as of the highest authority and the sound rule.    Contrary medical and scientific authority was emphatically rejected.    The matter was regarded of sufficient importance to warrant special treatment by Justice ANDREWS, resulting in its being held that "capacity of the defendant to distinguish between right and wrong at the time the act was done" was the only safe test; that he who is capable of knowing one from the other is bound, in law, to choose the right one regardless of the notions of some as to moral insanity or irresistible impulse.    It was said that "the vagueness and uncertainty of the inquiry which would be opened and the manifest danger of introducing the limitations claimed into the rule of responsibility, in cases of crime may well cause courts to pause before assenting to it."

Notwithstanding the emphatic adoption by the New York court of the capacity to distinguish between right and wrong test, as indicated, the pressure by eminent alienists to engraft onto it the irresistible impulse element, and others, was such that the legislature, evidently intending to guard the jurisprudence of the state from falling into confusion, or the safe rule from being departed from to the impairment of the safety of human life, incorporated it into written law.    *People v. Taylor,* 138 N. Y. 398, 34 N. E. 275.    The court there said that the eminent alienists who were disposed to criticise the rule and claim that a person should be held legally insane when by reason of an abnormal mental condition he acts under an irresistible impulse, should address themselves to the lawmaking power; that as the matter stood, knowledge of the nature

and quality of the act that a person is doing and that it is wrong, renders him legally sane. We should say, in passing, that the written law remains the same in New York as it was at the time of such suggestion in 1893.

This lengthy discussion of the subject of legal insanity seems warranted because of the evident misconception of what was held in *Butler v. State, supra.* We should further say in passing that the learned court, though having refused the requested instruction, gave others requested, going nearly as far as the one rejected and more liberal to the accused than the right rule demanded.

The court refused to specially instruct, as requested, that each juror should adhere to his own individual judgment from the evidence as to the defendant's insanity and not join with others in finding him sane so long as he entertained an honest reasonable doubt on the question. It is, said this court in *Franklin v. State,* 92 Wis. 269, 66 N. W. 107, regarding refusal to give a similar instruction,—error. Such does not seem to be the case. The difficulty there was in failure to charge on the legal presumption of innocence, not because the court, in addition to such a charge, did not admonish the jury that before finding the existence of a fact, each should come to the conclusion in that regard from his own judgment based on the evidence. When jurors are instructed properly they need not, necessarily, be told that they should not agree upon a verdict, unless individually convinced from the evidence of its correctness to the requisite degree of certainty. A person who has sufficient intelligence to sit on a jury knows, from the proper general instructions, that he should act according to his own judgment based on the evidence.

The claim made that it was error to refuse to instruct to the effect that as a matter of law epilepsy is a mental disease and that grief, agony, or terror is one of the producing causes of epileptic attacks, under the ruling of *Kreuziger v. C. & N.*

*W. R. Co.* 73 Wis. 158, 160, 40 N. W. 657, and some other
cases cited, does not seem to possess merit.   It is argued that
proof of epilepsy is proof of insanity and that the authorities
so hold.   As we read the citations, such is not the case.
They are to the effect that a person may be an epileptic and
be perfectly responsible for his actions, except when suffering
from an epileptic disturbance, called a fit; that epilepsy may
cause insanity, but does not constitute it, and the two should
not be confounded.   *Aurentz v. Anderson,* 3 Pittsb. Rep.
310.   That a person afflicted with insanity may yet have ca-
pacity to distinguish between right and wrong, and if so he
is legally sane.   *Fogarty v. State,* 80 Ga. 450, 5 S. E. 782.
That it is not sufficient to establish irresponsibility to show
epileptic affliction, but it must be shown by evidence as a fact
that epilepsy is a disease which affects the mind or produces
insanity, and that there was legal insanity in the given in-
stance.   *Walsh v. People,* 88 N. Y. 458.

Thus, whether the accused was afflicted with epilepsy, and
if so whether it was a mental disease, or whether it had pro-
gressed so far as to affect the mind, and if so whether the mind
was so affected that the accused was not conscious of the
wrongful character of his act at the time of the homicide,
were all matters of fact to be established by the evidence.

Complaint is made because the court refused to instruct the
jury to the effect that if the accused intentionally pointed the
gun at some other object than the deceased and the bullet was
accidentally deflected, striking the deceased with fatal effect,
he was not guilty.   The court gave the requested instruction
by adding the words "of murder in the first degree."   The
instruction might well have been refused altogether because
of its not being warranted by any evidence in the case.   As
we understand the evidence, the bullet went straight to the
person of the deceased; passing through the door, it is true,
because of that being suddenly partly closed between the per-
son of the deceased and the accused as the former saw the lat-

ter raise his gun. But if there were evidence that the gun was not pointed at the deceased, but yet was handled so as to be imminently dangerous to him or some other human being and regardless thereof, though without design to effect the death of any one, the accused was, nevertheless, guilty of some homicidal offense.

It is suggested that the court, by way of recital, said to the jury that experts on both sides had given opinions as to the sanity of accused at the time of the homicide, and also instructed so as to limit the effect of evidence, on the general issue, of defendant's mental condition, to murder in the first degree. It was not improper to speak of the obvious fact that the experts had expressed opinions on the question of sanity, leaving it to the jury to find whether, as matter of fact, the accused, at the time of the homicide, was sane or there was a reasonable doubt on the subject, the court suggesting, as was done, that the jury were not bound by the opinion evidence; that it was for them to decide from all the evidence, under the test given for legal insanity, whether the accused was sane at the time of the homicide, and if they believed he was not, or were in reasonable doubt on the question, to find him not guilty on that ground. The instructions as to evidence of mental impairment expressly informed the jury that it bore on whether there was design to take human life, and informed them, fairly, that it bore on whether the accused was conscious of his act being dangerous to human life. That, it seems, was sufficient.

During the trial of the special issue, unknown to the accused or his counsel till after trial of the main issue, letters addressed to a juror, or jurors, after having been examined by the judge and any reference to the case eliminated, were allowed to be delivered. The judge explained the occurrences as pursuant to an announcement made in open court after the jury were sworn, to the effect that written communications might pass between jurors and their families, subject to in-

spection by the court in all instances to guard against anything improper so reaching them from the outside or the outside from them, and that no objection was made by counsel upon either side.   No evidence of such announcement having been made appeared upon the clerk's or the reporter's minutes, neither did counsel on either side have any recollection of it.

Further irregularities in respect to the conduct of the jurors is suggested in that, as claimed, two jurors, during the trial, while standing at the open window of their room talked with two persons outside.   There was much proof to the effect that no such conversation occurred, except that a person from the street on the occasion of the claimed conversation, asked his father, who was on the jury, for some keys which, without saying anything, he passed out to the son.

The circuit judge explained that all written communications between jurors and outside parties, four or six in number, were between jurors and members of their families and that none were delivered during the trial which contained any reference to the case.   The suggested irregularities with the jury were brought to the attention of the trial court as ground for a new trial.

Thus it will be seen that not only is there no showing that the accused was prejudiced by the occurrence complained of, but prejudice is pretty clearly negatived.   Courts should be slow to disturb verdicts upon the ground of alleged misconduct of jurors or interference with their deliberations.   The motive to cast suspicion upon the result of a trial is so great, and the opportunity to do it so open and so easily embraced, especially in a case of great public interest, that, in most any such case, many little incidents actually occurring of a perfectly legitimate character may be easily given a false coloring, and other incidents, not legitimate, may be brought to the attention of the court without any reasonable ground for an inference of fact as to their having affected the result, and

still other incidents may easily be falsely claimed to have oc-
curred, so that unless such matters are held not to be suffi-
cient to disturb the course of justice, in the absence of clear
indications, and by preponderating inferences of fact, that
they, within reasonable probability, at least, materially af-
fected the result adversely to the complaining party,—the ad-
ministration of justice would be intolerably embarrassed to
the great detriment of public and private interests.    Doubt-
less the constructors of the Code by sec. 2829, Stats. (1898),
designed that such should be the guiding idea of judicial
practice in this state when they there provided, in mandatory
language, that:

"The court shall, in every stage of an action, disregard any
error or defect in the pleadings or proceedings which shall
not affect the substantial rights of the adverse party; and no
judgment shall be reversed or affected by reason of such error
or defect."

That has been referred to as a most beneficent provision,
precluding disturbance of judicial results by any inconse-
quential matter, and that, in the spirit of it, all irregularities
and errors should be deemed inconsequential, in the absence
of reasonably clear indications that the adverse party was
prejudiced thereby, in that, otherwise, the result, as to him,
might, within reasonable probabilities, have been different.
Under the guide of that statute judgments have been affirmed
though grounded on records bristling with error, of which the
following are significant illustrations: *Mauch v. Hartford,*
112 Wis. 40, 87 N. W. 816; *Miller v. State,* 139 Wis. 57, 94,
119 N. W. 850.

Such is believed to have been the general trend of the de-
cisions of this court, though it must be admitted that it is not
in harmony with expressions made now and then to the effect
that from the mere occurrence of error prejudice is presumed.
Doubtless, it was in great measure, because of such occasional
expressions that the legislature, very recently, thought, by

ch. 192, Laws of 1909, to challenge judicial attention anew to the declared public policy of the state in its written law, in providing that, no judgment in either a civil or criminal case shall be disturbed except for error which, in view of the whole situation, in the judgment of the court, affected the substantial rights of the party seeking to have it disturbed. That, in the judgment of the writer, is no more than emphasizing what was covered by the early Code provision and has been, in general, intended by the court to be firmly and fully carried out.  As such, it is welcomed by those who firmly believe it was unnecessary and does not really change the procedure in this state.  At least, it aids in unifying judicial sentiment, if that were necessary, as to the proper method of administering justice in order to render right results as certain, speedy, and economical as practicable, and in eliminating seeming or actual departures therefrom in the past, as evidenced by *Hack v. State,* 141 Wis. 346, 124 N. W. 492.

Of course, the legislature did not intend to, and could not if it would, control the court in the administration of justice by the act of 1909.  It was only intended to declare a public policy as to such administration which it is the duty, as well as the pleasure, of the court to conform to, so far as it reasonably promotes, or does not unreasonably interfere with, the exercise of their constitutional jurisdiction.

There is no longer, if there ever was, any reason for holding that a judgment should be reversed for mere errors, however numerous and inexcusable, or errors in the absence of its reasonably appearing as an inference of fact that the party seeking reversal was prejudiced thereby, in that had the error not occurred the result, as to him, might, within reasonable probabilities, have been more favorable.  That must be the true test of prejudicial error, displacing, if necessary, the idea that prejudice is to be presumed from the mere occurrence of error and giving controlling dignity to the idea that prejudicial error is presumed against, this presumption to prevail

till overcome, to the extent above indicated, by preponderating inferences of fact.    To go further than suggested would prob-ably invade the constitutional right to have the weight of probabilities respecting matters of fact determined by a jury or the trial judge according to circumstances.

In view of the foregoing it is thought that the claimed mis-conduct of the jury must be held to have been inconsequential. That is in harmony with the ruling in *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546.    It is claimed to be out of harmony with *Havenor v. State,* 125 Wis. 444, 104 N. W. 116; *Hurst v. Webster Mfg. Co.* 128 Wis. 342, 107 N. W. 666; *Du Cate v. Brighton,* 133 Wis. 628, 114 N. W. 103; and *Dralle v. Reedsburg,* 135 Wis. 293, 299, 115 N. W. 819, all decided, as will be seen, before the recent legislative ex-pression of public policy.    In any event, they are in a class by themselves.    They deal only with private communications between the trial judge and the jury.    Doubtless, the rule thereof should not be extended in letter or spirit.    No more need be said at this time.

We may well say, in closing, that notwithstanding the prac-tice of allowing written communications to pass between jurors and outside parties in such a serious case as this, or any, under the circumstances shown here, is held to be harm-less error, it must be condemned as improper.    The fact that many irregularities may occur in the progress of a trial with-out affecting the result, should not lead to any laxity in judi-cial procedure and will not be regarded as any excuse for it. In capital cases, especially, the greatest care should be taken by trial judges to so administer affairs as to leave the final re-sult free from any suspicion of improper influence.    To that end the jury from the time of being sworn in the cause till deliverance of their verdict may well be kept as free as prac-ticable from all, even appearances of, opportunity for com-municating with outside parties, or receiving communica-tions from them.

Thus we have reviewed the record of the two trials in this cause, giving careful attention to the complaints in quite minute detail without finding any harmful error, and very little error at all. On the whole, the cause seems to have been very fairly tried and the accused found guilty in due course. So the judgment must be affirmed.

*By the Court.*—So ordered.

A motion for a rehearing was denied October 4, 1910.