Musso, Plaintiff in error, vs. The State, Defendant in error.

*January 16—March 2, 1915.*

*Criminal law: Homicide by strangling: Evidence: Sufficiency: Trial: Fining witness for contempt: Opening case for rebuttal: Harmless errors: New trial: Newly discovered evidence.*

1. Evidence, stated in the opinion, tending to show that defendant strangled her husband in their house while he was intoxicated, is *held* to sustain a conviction of murder in the first degree.
2. The taking of evidence on a murder trial having closed at 10 o'clock in the evening, and a physician having testified shortly before the closing that he was present and assisted in photographing the body of the deceased, the trial court should, on the following morning, have opened the case to permit defendant to call witnesses who were present when the body was photographed and who would have testified that the physician was not present on that occasion; but the refusal to do so was not prejudicial error, it not appearing that such testimony would probably have affected the result.
3. Fining for contempt a witness for defendant in the presence of the jury is *held* not to have been a prejudicial error.
4. The denial of a motion for a new trial on the ground of newly discovered evidence, consisting mainly of the testimony of physicians as to an examination after the trial of the body of the murdered man, cannot in this case be held erroneous, such evidence not appearing to be of sufficient weight, nor the showing as to diligence sufficient, to warrant this court in disturbing such ruling.
5. The presumption being that by due diligence a party can discover and produce relevant and material evidence, a motion for a new trial on the ground of newly discovered evidence is received with great caution and is not entertained favorably.

Error to review a judgment of the municipal court of Milwaukee county: A. C. Backus, Judge. *Affirmed.*

For the plaintiff in error there was a brief by *Curtis & Mock* and *Dennis M. Sullivan, Jr.,* attorneys, and *Erwin G. Wurster,* of counsel, and oral argument by *Mr. E. A. Mock* and *Mr. Sullivan.*

For the defendant in error there was a brief by the *Attor-*

*ney General, Winfred C. Zabel,* district attorney, and *Henry S. Sloan,* of counsel, and oral argument by *Mr. Sloan.*

SIEBECKER, J. ˙ The plaintiff in error (hereinafter called the defendant) was convicted of murder in the first degree on January 6, 1914. The verdict was rendered on April 11, 1914. A motion for a new trial was denied by the court, and on May 11, 1914, the court sentenced the defendant to imprisonment for life in the state prison. The defendant prosecutes a writ of error to review the judgment of conviction.

It appears that the defendant and the deceased are Italians; they were husband and wife and had been married fifteen years; they had no children; three children of defendant's deceased sister resided with them, named and of the ages, respectively, Rosie De Gratiano nine years, Nofrio seven years, and Vincenzia four years. The deceased owned a homestead at 374 Cass street in the city of Milwaukee, and he and defendant occupied the upper part of it. The lower part of the house was occupied by a family named Foti. The members of the Foti family were the husband Angelo, the wife Mary, their children, a brother, and a cousin.

During the evening of January 5, 1914, at about 7 o'clock, the deceased, the defendant, and the three children living with them visited the cousin of the defendant, Dominick Nuccio, and wife, where they spent the evening, and while there they drank some beer. The deceased, the defendant, and children returned home at about 9:30 o'clock. The first information of Musso's death came to Isador Aiello, who lived in a house at the same number, but situated on a part of the lot nearer the street and in front of the Musso house and in which Nofrio·Aiello conducted a bakery. At about ten minutes past 12 o'clock in the night the defendant came to his place and told him Musso was dead. He went with her to the Musso rooms and saw Joseph Musso lying in bed dead. He felt of his body and found it was a little warm. The de-

fendant told Aiello that Musso had come home drunk, scratched himself, and had acted sick. The witness states that he then observed material on the floor, on the kitchen sink, and on the carpet near Musso's bed that looked like vomit. The defendant told him that she got up to get Musso a drink of water and then saw he was dead. Aiello testifies that Musso had on a nightgown and that defendant had on a black skirt and that she cried. There is no evidence that any one, except defendant and the children, saw Musso from the time they left the house of Dominick Nuccio to go home, near 9:30 o'clock, until Aiello saw him dead in his bed about ten minutes after 12 o'clock. The defendant testified that no one came to their home after their arrival in the early part of the evening until Aiello came in response to her call. She related the facts and circumstances of their visit to Nuccio's and their return home; of Musso's going out again and his return home about 11:30 o'clock in a state of intoxication. She described that she heard Musso coming up the stairway; that she got up and let him in and locked the door after he entered; that they had no conversation; that she returned to the bed with the children, heard him in the kitchen undressing; that he groaned and moaned before and after he went to his bed, and that when she went to him after midnight she found him dead and then called Aiello, who came with her and found Musso dead in bed.

Dr. McGovern made examinations of Musso's body on January 6th, 7th, and 10th at the morgue and he and Dr. Young made an autopsy. They testified in effect that the deceased was a man of about the height of five feet four inches and estimated his weight at 140 pounds. They found cyanosis of the skin of the face, neck, and ears; the face and neck were covered with a great many abrasions; there were small abrasions on the right frontal eminence, on the nose, nose tip; eleven abrasions on the left side of the face above the lower margin of the chin, a large one on the side of the chin below

the lip, and one below the right angle of the mouth; a large number of abrasions existed below the chin line on both sides; on the left side of the larynx and trachea were a number of marks that a finger nail fitted into, corresponding to the index and middle fingers of the right hand; on the opposite side of the larynx and trachea were two larger semi-lunar marks that could be made by the thumb; there were abrasions on the center, on the point, and over the head of the humerus of the right shoulder, and some abrasions on the arms; there was a contused mark in the center of the abdomen between the navel and cartilage above, other abrasions on the side and back of the body.    An opening of the body showed that blood vessels had been broken, blood had infiltrated into the tissue on the left side of the neck, to the right of the larynx and trachea; the lungs were congested, the right side of the heart contained considerable blood, the liver was congested, all of the abdominal organs were normal except this congestion; upon removal of the larynx, trachea, and esophagus together, and opening the larynx and trachea, they found hemorrhage patches and the mucus membrane was larger at the upper end, no thickening of it; the hyoid bone was broken about the middle of the left side; the brain was normal.    The doctors testified that in their opinion the abrasions and marks on the neck and face were made by fingers and finger nails, that death was caused by suffocation and strangulation, and that it resulted at the time of pressure, which when applied from one to two minutes would produce death inside of five minutes.    Both doctors gave it as their opinion that Musso did not die a natural death.    It appeared that Musso had been in good health and that he was possessed of normal physical strength.

Counsel for the defendant contend that the evidence is wholly insufficient to sustain the jury's finding that deceased came to his death by strangulation and that strangulation and suffocation were produced by some one other than the de-

ceased. The external marks of injury on decedent's face, neck, and other parts of his body, in connection with the congested condition about the larynx and trachea, the break in the hyoid bone and the cyanotic condition of the skin, and the surrounding facts and circumstances, tend clearly to support the conclusion that death resulted from strangulation. The claim that some one other than deceased effected his death is also well supported by the facts and circumstances tending to show that he had no suicidal tendency, that the circumstances and facts of his life and conduct present no occasion naturally inducing and impelling self-destruction, that the evidence of injury to his body indicates that he was assailed by force and violence, which it was well nigh impossible to inflict upon himself, and all the surrounding conditions, which existed when he was first seen by Aiello and others, negative the claim that he destroyed himself. The evidence upon these questions, in our opinion, is amply sufficient to warrant the jury in concluding that deceased came to his death by strangulation and that it was the result of violence inflicted by some one other than himself.

It is strenuously argued that the proof wholly fails to show that the defendant is the person guilty of having committed the homicide. This claim rests mainly on the ground that the court erred in concluding that the evidentiary facts and circumstances, aside from the evidence of the child Rosie, justify the inference of defendant's guilt. Rosie testified that the defendant is her aunt and the deceased is her uncle. She relates the facts of the family's visit to Nuccio's, their return home and retiring for the night. She states that she heard defendant and her uncle quarrel over money and that defendant choked deceased, and that he thereafter retired to his bedroom and went to bed. She made statements to the effect that defendant removed deceased's shirt and burned it; that defendant changed the bed sheets, and that defendant put her skirt with blood spots on it into the bag found by the

police officer, and that defendant called her in the night and stated to her that her uncle was dead and told her to tell the people that he fell down the steps and got hurt. The statements so made by this witness were in other parts of her testimony contradicted by conflicting statements, by denial thereof to the person who had her in custody before trial, and by admitted facts and circumstances. Much of her evidence is also involved in confusion and uncertainty. The detail of her evidence is of such length and so disconnected that it cannot be abridged into a succinct and connected narrative, and hence reference to the foregoing salient features can only be reproduced here. The trial court, at the time of ruling on the motion for a new trial, characterized her evidence as follows: "So far as the testimony of Rosie De Gratiano is concerned, she is completely discredited on the stand by the testimony of the sheriff, the sheriff's wife, and the matron. The credibility of her testimony was for the jury, and they undoubtedly gave her testimony very little weight." We think, after a careful study of her evidence, that this is a correct estimate of her evidence and a proper conclusion of the probable treatment of it by the jury in deliberating on their verdict.

The defendant had been somewhat sickly, weighing about 110 pounds. She had no marks nor abrasions on her person after the alleged homicide. She testified to the effect that she and Musso had no trouble of any kind; that no other person came to their rooms that night before his death. Her various narratives of the details as to what took place in the house that night, what Musso and she did, her explanations of what underwear he wore the night of his death and after, her destruction of the old underwear, and many of the details need not be repeated here. An examination of them shows that they vary in material parts at different times. It appears that when others came to the Musso home the defendant related these circumstances to them. Among others

she stated that he had taken $5 which she had in her posses-
sion before he left the house and returned without any; that
she stated to the coroner, when he called upon her in the
morning, that Musso had been drinking whisky, and showed
him a bottle which upon examination by the coroner appeared
to have no odor of liquor.   The body of Musso was removed
to the morgue during the day following his death and there
was removed from it a clean undershirt and a clean pair of
drawers.   The defendant expressed a wish to have him buried
immediately.   A neighbor and acquaintance, Mrs. McCarthy,
testified that she was requested about 9 o'clock in the morn-
ing of January 6th by one Mat De Nofo, who had formerly
boarded with the Mussos, to call on defendant at her home;
that when she arrived and saw the deceased she observed the
swollen and scratched condition of the deceased's neck and
throat and that she partially removed the clothing from his
chest and body and saw his undershirt rolled at the chest;
that the stomach region had scratch marks and a bruise on
the side, and upon inquiry by her who did that, defendant
replied, "Nobody, he did it himself," stating that he came
home drunk and fell down three times in coming up the back
stairway.   The witness also testified to a conversation with
defendant during the preceding holidays, in which the defend-
ant complained that her husband had the habit of excessive
drinking and that she could hardly endure him and that she
was afraid some calamity would befall him when out with
money in a state of intoxication, and that he refused her
money for purchasing their necessaries.   This witness also
testified that she observed Musso from her home going to his
work and that she knew that Mat De Nofo had some time
theretofore lived at the Musso home, and during some three
months before January 6th she saw him during the day com-
ing to and departing from the Musso house.   There is evi-
dence of the fact that defendant's skirt, which she states she
wore on January 5th, was found in a bag beneath clean

clothes in a folding bed in the children's bedroom, having human blood stains on it.   There was also found part of a man's pair of soiled drawers with blood stains on them, a handkerchief and a pillow sham with blood stains, in the kitchen and other parts of the house, and that blood was found on a door casing.   These blood stains responded to tests and examination and were found to be human blood.

Considering the case from the viewpoint of the trial court, was he justified in ruling that the facts and circumstances of the case, established by evidence other than that of Rosie, warranted the inference of defendant's guilt?   We are persuaded that this conclusion of the court is well sustained by the record.   In the foregoing statement we have given the salient features of the evidence.   It appears from defendant's declaration and otherwise that deceased arrived home at about 11:30 o'clock; that she met him at the door and locked it after he had entered; that no other human being aside from herself and the children were in the house; that within the succeeding forty-five minutes after his return home he had expired; that when she gave the alarm of his death to the neighbors, one of whom immediately came to Musso's rooms, his body was found in an orderly position in bed and so cooled that upon touching it he found it was somewhat warm.   The evidence also warranted the inference that the accused had secreted the skirt she wore during the evening, having human blood spots on it; that she had destroyed a part of deceased's underwear which he had on during the day and probably in the night, and that the part remaining thereof had human blood spots on it.   Defendant's various statements and explanations of decedent's actions after his return home at 11:30 o'clock and of her conduct from that time to the time she states she found him dead are pregnant with suggestions that they are not based on truth.   The details of what occurred in the house and her conduct in relation thereto are characterized as improbable under the conditions testified to

by her and they lead to a belief that her explanations are not the whole truth of what transpired at that time. A few facts stand out as reasonably certain and point with reasonable clearness to defendant's guilt. These are: Musso's death at this fixed hour of the night; that he was forcibly and violently assailed and strangulated; that this took place in his house; and that no adult person other than the defendant was with him at the time.

It is argued that it was impossible for defendant, a woman who is somewhat frail in physique and light in weight, to have overcome the resistance the decedent must have exerted in defense of his life when assailed by her as charged. We are not persuaded of the correctness of this claim. It is not a matter of common knowledge that in such an encounter it is physically impossible for a woman like defendant to accomplish the act charged; and we must keep in mind that there is ample evidence to show that the deceased was intoxicated when he returned home, which naturally tended to lessen his abilities of self-defense against an assault by defendant. Under the conditions shown this was a question for the jury, and their conclusion against the accused is amply sustained by the evidence. When the jury found that the decedent had been feloniously killed, they were justified in their conviction that defendant was guilty of the killing.

We have examined the exception to the admission of the evidence of Drs. McGovern and Young and also the exception to the action of the court in proceeding to fine the witness D. Nuccio for a contempt in the presence of the jury, and conclude that the rulings and proceedings were not prejudicial and erroneous. The exceptions must be held not well taken.

It is urged that the court committed prejudicial error in denying the application to open the case and permit the defendant to introduce evidence to rebut the testimony of Dr. McGovern to the effect that he was present and assisted in photographing the body of Joseph Musso. It appears that

the court closed the taking of evidence at 10 o'clock in the evening and took a recess for the day. When the court convened the next day, defendant's counsel asked the court to permit them to call witnesses who were present and assisted in the photographing of the body who would testify that Dr. McGovern was not present at such occasion. We think the court should have admitted the evidence offered, but we are not convinced that this ruling operated to defendant's prejudice. It does not appear to us upon the record that the jury would have reached any other conclusion than they did, had the evidence been submitted to them. *Oborn v. State,* 143 Wis. 249, 126 N. W. 737.

It is further urged that the court erred in denying defendant's motion to grant a new trial on the ground of newly discovered evidence. The affidavits of Drs. Becker, Beffel, and Koeppel were submitted on this motion. They show what steps the doctors took to examine the body of Joseph Musso after trial on April 23d. There were also submitted on this motion the affidavits of the witnesses who claim to have been present when the decedent's body was photographed denying Dr. McGovern's presence, the affidavits of persons and a letter of Rosie's tending to impeach her statements, and the affidavit of defendant's counsel setting forth their diligence and their inability to produce the newly discovered evidence on the trial.

We need not consider the points as to the impeachment of Dr. McGovern and of the child Rosie for the reason, heretofore adverted to, that had such evidence been submitted to the jury the record does not indicate that a different verdict would have been found. The facts disclosed by the examination of Musso's body by Drs. Becker, Beffel, and Koeppel do not present a ground for a new trial. The opinion of these experts is not of sufficient weight to warrant this court in overruling the trial court in denying a new trial, nor do the facts showing what diligence was exercised establish that the omission of such examination before trial is excused. It must

have been apparent to the defense that the state must produce evidence of the nature given by Drs. McGovern and Young and that it would be very material for the defense to present its view on the issue of fact thus raised as to the cause of Musso's death. The presumption is always that by due diligence the parties to the action can discover and produce relevant and material evidence. It is for this reason that the motion for the new trial on the ground of newly discovered evidence is received with great caution and not entertained favorably. Under the circumstances it was not error for the trial court to deny a new trial upon this application. *Hedger v. State,* 144 Wis. 279 (128 N. W. 80) and cases cited on page 314. The proceedings on the trial disclose that the accused has had a full and fair trial and that the evidence fully sustains the verdict of the jury. There is no reversible error in the record.

*By the Court.*—The judgment is affirmed.