KOSCAK, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 12—March 23, 1915.*

*Criminal law: Explosives: Intent to destroy property: Knowledge of intended use by others: Statute construed: Separating offenses: Essentials: Instructions to jury: Instigation of crime by detectives.*

1. Under sec. 4398a, Stats., the having in possession or dealing in any of the ways there specified with an explosive compound with intent that the same shall be used for any of the purposes there mentioned, constitutes an offense; but the words in the latter part of said section "or knowing that such explosive compounds are intended to be used by any other person or persons for any such purposes," define a different offense, which is not committed unless a person other than the accused *in fact* intended to use the compound for the unlawful purpose.

2. Thus, if an accused purchased and transported dynamite and had it in his possession with intent that it be used for the injury of private property, he was guilty of an offense under the first part of said sec. 4398a; but where he believed that the dynamite was to be used for the unlawful purpose by persons who appeared to be co-operating with him but were in fact detectives, and who had no intention of using the dynamite for such unlawful purpose, he was not guilty of the offense defined in the latter part of the section.

3. Where, in such a case, instructions to the effect that the absence of any real intent on the part of the other persons to use the dynamite unlawfully was no defense to the accused were so incorporated in different parts of the charge and so interwoven with the definition of the offense first specified in the statute that it is impossible to determine of which offense the accused was found guilty, the conviction cannot stand.

4. If, in such case, detectives employed by the private person against whose property the accused believed the dynamite was to be used, were the active parties in prompting, urging, and instigating the perpetration of the offense, and the accused was only a passive participant through their incitement and intimidation, such private person was bound by the acts of the detectives, and the accused was not guilty of the offense.

5. Where there was evidence tending to establish such facts, a refusal to give a requested instruction in accordance with the law as above stated was error.

BARNES, J., dissents.

· ERROR to review a judgment of the circuit court for Kenosha county: E. B. BELDEN, Circuit Judge. *Reversed.*

The plaintiff in error (hereinafter called the defendant) was convicted in the Kenosha county circuit court of buying, transporting, and having in his possession dynamite, with the intent that it should be used for the unlawful purposes denounced in sec. 4398*a,* Stats. 1913, or knowing that such dynamite was intended to be used by other persons for such unlawful purposes. On March 25, 1914, the court sentenced the defendant to imprisonment in the state prison for a term of five years. For review of the judgment of conviction and sentence the defendant prosecutes this writ of error.

The record shows that the defendant in September, 1909, was in the employ of the Thomas B. Jeffery Company at the city of Kenosha, Wisconsin, and that he claims that he was injured at about this time while in such service and that the injury resulted in breaking three of his ribs. During the following six months he did not do full work, but received full pay, and thereafter until May 29, 1913, he was furnished light employment and was paid $2 a day. In June, 1913, while attempting to move a shed building at his home, he claims to have been disabled, which prevented him from returning to his work Monday, May 29, 1913. On that day he was discharged from service on account of his failure to return to his work. Shortly thereafter he called upon Charles Jeffery and asked to be re-employed and was told by Mr. Jeffery to call at his office the following day. Defendant did so and learned that Mr. Jeffery was not present, and he was then referred to a Mr. Taylor, who acted for the company and requested defendant to return at 3 o'clock p. m. Defendant appeared at this time and Taylor informed him that he could not secure re-employment and accused him of deception in claiming that his ribs were broken while in the service of the Jeffery Company, and asserted that his ribs were injured in Cleveland, Ohio. *Koscak* testified that he saw Charles Jef-

fery at the office later in the afternoon, after Taylor informed him that Jeffery would not be there for a long time. On July 9, 1913, the defendant sent a letter to Charles Jeffery complaining of Taylor's treatment of him and of their refusal to reinstate him in the company's service. The letter contains the following:

"So I told your Taylor that it was the last time I was there and by you also.

"Now I am asking you for the last time will you pay me for my three ribs, which I got broken in your factory? or not? I know that you have plenty of money so buy me my health back and new ribs, and I never ask you any more although I know that you can't get me my ribs back, so please think it over as I don't wish to be played with any more. I know that you have lots of everything so you can play with people that has no bread to eat.

"Now Mr. Jeffery, I will wait three more days for your answer. After that I will not wait any longer, then you see what a poor man can do, in short time. Then I am going to play with all that plays with me now. You will lose your millions just as I lost my ribs. Hoping to get satisfactory answer, I will remain yours truly,

"GEO. KOSCAK,
"37 North Main."

The defendant wrote this letter in Croatian, his native language, and had one Mrs. Sheba translate it into English. He told Mrs. Sheba that he had the power to put Mr. Jeffery into sickness and keep him sick until defendant released him. Defendant also testified upon the trial that he possessed such power, but had sworn off using it when he married and came to this country. He also told the detective Poppic that he possessed such power. When Mr. Jeffery received this letter he evidently became alarmed concerning the safety of his property and his person and he immediately conferred with Mr. DeCou, manager of the Jeffery Company's business, and directed him to confer with Mr. Burns, in charge of a detective agency at Chicago. Mr. Jeffery also communicated with

defendant at once, requesting to see him, and on Monday, July 14th, defendant and his daughter called upon Mr. Jeffery in answer to his letter and defendant asked for permanent employment or pay for his injuries. The company had him examined and a skiograph taken to ascertain the condition of his ribs, and after conferences with him employed him to do light work at $2 a day. The defendant apparently started at this work about July 26th. The evidence tends to show that a Mr. Lewis of the Burns agency was at Kenosha within a few days after Jeffery received the defendant's letter until he was succeeded on the 30th of July by a detective named Brunswick. Mr. Lewis evidently directed his efforts to watching defendant's movements, and nothing is shown indicating that he observed anything unusual in defendant's conduct or acts. Brunswick remained until August 2d, when he was discharged at DeCou's request upon the ground that he was not trustworthy. Brunswick made written reports to the agency at their Chicago headquarters, stating that defendant was a dangerous man, and he also reported this in effect to Mr. DeCou in person. After Brunswick's discharge from the case he had trouble with the Burns agency. He testified at the trial, stating that defendant had told him while working with him at the factory that he was well satisfied as things then were between him and the Jeffery Company. He also testified that Mr. DeCou suggested to him to undertake a different scheme to catch defendant and that he must be put in prison. DeCou denies all of Brunswick's charge of any plotting by him and the detectives to induce defendant to commit some offense. Brunswick testified that his reports to the effect that defendant was a dangerous man were false. Brunswick was followed by detective Prendergast on August 7th, who was principally engaged in watching defendant and the homes of DeCou and Jeffery. Prendergast testified that he was thereafter discharged from service of the Burns agency; that while engaged as detective in Kenosha on the

*Koscak* case he had instructions from Hanson and Thompson, who were his superiors in the detective agency, to get the defendant, and if necessary shoot him while upon the premises of DeCou. Mr. DeCou, testifying on this point, denies that he approved of shooting *Koscak,* but states that Prendergast proposed it and that he remonstrated and told Prendergast that he would not countenance killing defendant or any one on his premises. He approved of having defendant decoyed upon his premises and there arrested before injuring him, his family or property. Prendergast also testified in effect that DeCou suggested that defendant be induced to enter into a scheme of using dynamite to destroy DeCou's home; also that his superior, Hanson, complained to him about the failure to get defendant, and that Hanson told him they were going to get the detective Poppic to get in with defendant and tempt him to steal some property; that defendant refused to be a party to a theft, and that it was then proposed to have Poppic and defendant discharged from service and thus arouse defendant's feeling of revenge and to have Poppic work with him for revenge and then frame up something on defendant. All of this was denied by Hanson and DeCou. It appears that Prendergast was convicted of an offense and imprisoned for twenty-four days; that his arrest in this case took place while in the employ of the Burns agency and that this led him to entertain ill feelings against the agency. On August 14th detective Poppic was assigned to Kenosha and directed to take up this investigation. Poppic worked at the Jeffery establishment ostensibly as an employee and became acquainted with the defendant. Poppic planned a scheme of appearing to steal valuable articles from the company and acquainted defendant with his designs of thievery, but found defendant unwilling to join him. As he expressed it, "He [defendant] says to me, 'That is all right, you can steal how much you want; I am not going to do it.' I says, 'That is all right, I will do it myself.' " This failure of trapping defendant into

thievery occurred Saturday, August 16th.   The following
Friday, August 22d, the Jeffery Company went through the
form of discharging Poppic from service as a factory em-
ployee, and on the next day, Saturday, defendant was dis-
charged from service by the company.   That evening Poppic
visited defendant at his home and, as he reported to the
agency, found defendant and his family in a state of excite-
ment about defendant's discharge from service, which led de-
fendant to unburden his troubles to Poppic.   The report
shows that Poppic played the part of an injured discharged
employee and pretended that he was defendant's friend and
that he would join defendant in seeking revenge on DeCou
for their unjustifiable discharge from service, declaring:

"I [Poppic] grabbed his [defendant's] hand and I said,
yes, I will get revenge on the man that discharged and in-
sulted me.   But listen, I said to him, we cannot do anything
now, tomorrow when I will come at 11 a. m.   We will plan
tonight and tomorrow we will advise ourselves which is the
best plan but keep quiet about it. . . . As far as I can see
Mr. DeCou's life is in danger and it makes me feel doubtful
about my own.   My plan will be to dynamite Mr. DeCou's
house."

On the trial Poppic testified in denial of these specific facts
of the interview and states that the following day, Sunday,
when he took dinner with the family of defendant, they talked
over the matter of discharge, but states nothing of revenge or
the use of dynamite.   But in his report to the agency of his
interview he again refers to the subject of dynamiting De-
Cou's home for revenge, and that defendant suggested gaso-
line, which Poppic declares he understood referred to a large
quantity stored in the Jeffery establishment, and that he pro-
tested against using this because it might injure some inno-
cent people.   On the stand he gave nothing of that interview
with *Koscak*.   *Koscak's* version of their interview is wholly
different and in denial of what Poppic reported or testified to

on the trial in all material parts.    At this. time Poppic asked
to board with the defendant, to which defendant consented.
Defendant and Poppic went to Chicago.    This was probably
the following Monday—there is some confusion on this point.
Poppic declares they went pursuant to a mutual arrangement
and understanding to purchase dynamite; the defendant testi-
fies that he was invited to go by Poppic, but had no under-
standing or knowledge that it was for the purpose of buying
dynamite until he heard Poppic ask for dynamite while at a
hardware store in Chicago.    It appears that on the succeeding
Wednesday Poppic informed defendant that he received a
message from one Boitano, a friend of Poppic, a very des-
perate man, who was willing to assist them in carrying out a
dynamite plot against DeCou.    It appears that Boitano ar-
rived and met defendant and Poppic at the depot in Kenosha
and there arranged to undertake jointly to secure dynamite
and use it to injure DeCou's home for the purpose of obtain-
ing money from him and to have defendant and Poppic get
the dynamite in Racine at once; that defendant and Poppic
went there the next day to make an order for dynamite and
that defendant made the order; that defendant on Friday,
August 29th, went to Racine alone and secured the dynamite
and returned to Kenosha with it; that on his return to Keno-
sha he met Poppic and Boitano near the depot and showed
them the dynamite; that it was agreed that defendant was to
keep it at his house until about 8 o'clock that evening, when
Poppic and Boitano would call to get it and use it in the night
to destroy DeCou's home.    About the time fixed for the de-
fendant to meet Poppic and Boitano the sheriff and others
appeared and arrested the defendant.    The dynamite, caps,
and other material to explode it were found in defendant's
possession.    The defendant had not taken any step to expose
the plan from the time the subject of injuring DeCou's prop-
erty by dynamite had been spoken of by Poppic nor had he
done anything by way of attempting to reveal it.    He testi-

fied that he did not dare do this because Poppic had threatened his life if he did. It appears that when Boitano arrived at Kenosha and met the defendant he went with him to a toilet and showed him a revolver which Boitano carried on his person. Boitano admits that he did this to intimidate the defendant and that it seemed to have the desired effect. There is much evidence giving in detail the well nigh innumerable incidents showing defendant's course of conduct, the conduct of the detectives and that of DeCou throughout the period from July 9, 1913, the date of defendant's letter to Mr. Jeffery, to August 29, 1913, the date of defendant's arrest. This evidence is too voluminous to repeat here in substance. The foregoing is referred to for the purpose of reviewing the errors which defendant alleges in this court. The entire record evidence must necessarily be considered to understand the case for the purpose of reviewing the errors defendant claims were committed upon the trial which entitle him to have the judgment reversed.

For the plaintiff in error there was a brief by *Norman L. Baker* and *Robert N. McMynn,* attorneys, and *N. L. Baker & W. J. Zimmers* and *Harper & McMynn,* of counsel, and the cause was argued orally by *Mr. Baker* and *Mr. McMynn.* They cited, among other authorities, *Love v. People,* 160 Ill. 501, 43 N. E. 710; 12 Cyc. 160; *State v. Currie,* 13 N. Dak. 655, 102 N. W. 875, 877; *Johnson v. State,* 3 Tex. App. 590; *Scott v. State,* 70 Tex. Crim. 57, 60, 153 S. W. 871, 872; *Comm. v. Bickings,* 12 Pa. Dist. 206; *Dalton v. State,* 113 Ga. 1037, 39 S. E. 468; *State v. Piscoineri,* 68 W. Va. 76, 80, 69 S. E. 375; *U. S. v. Healy,* 202 Fed. 349, 350; *People v. Smith,* 251 Ill. 185, 95 N. E. 1041; *People v. McCord,* 76 Mich. 200, 42 N. W. 1106, 1108; *Connor v. People,* 18 Colo. 373, 33 Pac. 159, 25 L. R. A. 341; *Saunders v. People,* 38 Mich. 218; 1 Wharton, Crim. Law (11th ed.) § 389; *People v. Mills,* 91 App. Div. 331, 86 N. Y. Supp. 529, affirmed in 178 N. Y. 274, 70 N. E. 786; *Grimm v. U. S.* 156 U. S. 604,

15 Sup. Ct. 470; *Scott v. U. S.* 172 U. S. 343, 351, 19 Sup. Ct. 209; *Evanston v. Myers,* 172 Ill. 266, 50 N. E. 204; *People v. Krivitzky,* 168 N. Y. 182, 186, 61 N. E. 175; *People v. Conrad,* 102 App. Div. 566, 92 N. Y. Supp. 606, affirmed in 182 N. Y. 529, 74 N. E. 1122; *State v. Littooy,* 52 Wash. 87, 100 Pac. 170; *O'Brien v. State,* 6 Tex. App. 665; *State v. Dudoussat,* 47 La. Ann. 977, 995, 996, 17 South. 685.

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Alfred L. Drury,* district attorney, and oral argument by *Mr. Messerschmidt* and *Mr. Drury.* They cited 1 Bishop, Crim. Law (8th ed.) § 262; 1 McClain, Crim. Law, § 118; *People v. Liphardt,* 105 Mich. 80, 62 N. W. 1022; *Davis v. State,* 70 Tex. Crim. 524, 158 S. W. 288; *People v. Bock,* 125 N. Y. Supp. 301; *Thompson v. State,* 18 Ind. 386, 81 Am. Dec. 364, 366; *Topolewski v. State,* 130 Wis. 244, 109 N. W. 1037; *Comm. v. Hollister,* 157 Pa. St. 13, 27 Atl. 386, 25 L. R. A. 349, 353, 354; *State v. Smith,* 152 N. C. 798, 67 S. E. 508, 30 L. R. A. n. s. 946 and note; *State v. Currie,* 13 N. Dak. 655, 102 N. W. 875, 69 L. R. A. 405; *Rath v. State,* 35 Tex. Crim. 142, 33 S. W. 229; *People v. Conrad,* 102 App. Div. 566, 92 N. Y. Supp. 606, affirmed in 182 N. Y. 529, 74 N. E. 1122; *State v. Abley,* 109 Iowa, 61, 80 N. W. 225; *People v. Krivitzky,* 168 N. Y. 182, 61 N. E. 175; 2 Woollen & Thornton, Intox. Liq. sec. 707; *State v. Piscoineri,* 68 W. Va. 76, 69 S. E. 375; *Chicago v. Brendecke,* 170 Ill. App. 25; *People v. Mills,* 178 N. Y. 274, 70 N. E. 786; *State v. Littooy,* 52 Wash. 87, 100 Pac. 170; and other cases.

SIEBECKER, J. By sec. 4398a, Stats. 1913, it is enacted: "Any person who shall make, manufacture, compound, buy, sell, give away, offer for sale or to give away, transport or have in possession any nitroglycerine, giant, oriental or thunderbolt powder, dynamite, ballistile, fulgarite, detonite or

any other explosive compound with intent that the same shall
be used in this state or anywhere else for the injury or destruc-
tion of public or private property or the assassination, mur-
der, injury or destruction of any person or persons, either
within this state or elsewhere, or knowing that such explosive
compounds are intended to be used by any other person or
persons for any such purpose, shall be punished" by imprison-
ment or fine.    The context of this statute clearly means that
it is an offense for any person to make, manufacture, com-
pound, buy, sell, give away, offer for sale or to give away,
transport or have in possession, any of these explosive com-
pounds, "with intent that the same shall be used" for the for-
bidden purposes.    It is manifest from the words that if a
person have the intent that the explosive compound is to be
used in the forbidden manner, when he deals with it in any
of the ways specified in the statute, he is guilty of violating
the statute and subject to punishment.    If then the facts and
circumstances of this case tend to show that the defendant
dealt with such an explosive compound in any of the respects
enumerated, having an intent that the same was to be used
for any of the forbidden purposes, then he may be convicted
and punished for such act.    The last part of the statute in
the words: "or knowing that such explosive compounds are
intended to be used by any other person or persons for any
such purpose, . . ." shall be subject to punishment, defines
an offense different in nature from the one first defined.    The
language here used embraces the element of having knowledge
that another person in fact intends to use the explosive com-
pound for the forbidden purpose.    It follows that this of-
fense can be committed only when it is shown that the person
accused had knowledge that another person in fact intended
to use the explosive for the unlawful purpose.    It is therefore
essential to constitute this offense that the fact appear that a
person other than the accused in fact intended to use the dan-
gerous compound for the unlawful purpose, and if such fact

of the intended unlawful use of the explosive is not shown, then the offense defined in this part of the statute is not established. It is elementary that every essential of the offense charged must be established to constitute a violation of the criminal law.

Applying the statute to the state of the evidence before us, it appears that there is evidence tending to show that the defendant on the day of his arrest had purchased and transported dynamite in and from Racine and had it in his possession with the intent that the same was to be used in Kenosha for the injury of the property of DeCou. This purchase and transportation of the dynamite and having it in possession with the intent that it should be so used for the forbidden purpose constituted an offense denounced by the first part of the statute. If the jury believed that he voluntarily committed such an act they were warranted in finding him guilty thereof. When we come to consider the evidence bearing on the charge in the information that the defendant so bought and transported dynamite knowing that it was intended to be used by other persons for the unlawful purposes, the proof fails to establish the offense. It is of course admitted that the detectives Poppic and Boitano had no such intent or design. They were the agents of DeCou and Jeffery and were operating for them to detect the defendant in the commission of the alleged offense. The circuit court instructed the jury in different parts of his charge to the effect that the fact that the detectives did not have any intent to use the dynamite for an unlawful purpose was no defense to the defendant. The court stated: ". . . The mere fact that such person facilitated the execution of the crime and appeared to co-operate in its execution will be no defense to the accused for his criminal acts and his criminal intent, if any, *or his knowledge of criminal intent, if any, either apparent or real on the part of the others.*" In another portion of the charge the court said: "It is no defense . . . that the persons associated with defend-

ant in the alleged criminal plan had not in fact the intention of using the dynamite for any of the unlawful purposes, . . ." and that defendant was guilty if they found he had "the settled belief, amounting to knowledge, that another or others intended using it for either or any of the unlawful purposes mentioned." These instructions were incorporated in different parts of the charge and are so interwoven with the definition of the first offense specified in the statute that they can-not be separated, and manifestly the jury could not do so in their deliberation on the case. From this it results that the case was erroneously submitted to the jury in such a way that it is impossible to know of what offense the jury found the defendant guilty. As heretofore stated, the evidence may warrant a finding that defendant bought and transported dynamite with the intent of having it used for the forbidden purpose, but we cannot say that the jury did agree upon this proposition, for the reason that this question is nowhere submitted to them without including in it as an element thereof the offense of knowing that others intended to use it for such unlawful purposes. It is impossible to extricate the jury's verdict from this confusion in the case, and hence it is impossible to know whether or not the jury agreed on the guilt of the offense which the evidence may justify should the jury believe him guilty thereof beyond a reasonable doubt. As the record stands, a serious error in instructing the jury pervades the whole case which clearly tended to jeopardize the defendant's rights on the trial of this grave offense.

It is urged on behalf of the defendant that the court erred in refusing to instruct the jury as requested respecting the influence on defendant of the detectives' conduct in their efforts to entice, lure, and intimidate him into commission of the alleged offense and in refusing the instruction that the defendant is not guilty "if he bought the dynamite and had it in his possession, not because of a desire and intent that it be so used, but because he was induced by threats and intimidation to buy, transport, and possess it." We have studied

the record with care to ascertain what effect to attribute to
the practices and course of conduct of the detectives and
those who employed them.   Of course, if the acts and con-
duct of the detectives transgressed the limits of the law, then
the result thereof must be borne by them and those per-
sons who employed them if they had knowledge of what they
did.   In law if detectives act as agents of others, then their
acts are attributable to those who employ them, in determin-
ing whether an alleged violation of the law was in fact origi-
nated, instigated, and perpetrated by such detectives in con-
junction with the party accused.   So here, if the facts and
circumstances warrant the finding that the detectives were the
active parties in originating and carrying out the perpetration
of the offense and the defendant was only a passive partici-
pant in these acts, through the incitement and intimidation
of the detectives, then DeCou and Jeffery are bound thereby
as the acts of their agents in the matter, to the same extent as
if they had personally taken the part of the detectives.   It is
apparent from the record that the detectives in this case em-
ployed reprehensible means and practices to involve the de-
fendant in criminal conduct.   This is shown by such conduct
as the alleged purpose of shooting the defendant, if he could
be induced to enter DeCou's premises with intent to injure
him; by exhibiting to him revolvers to intimidate him; in
securing the services of the person Boitano as a desperado to
frighten and intimidate him, and Poppic's invasion of the de-
fendant's home under the color and pretense of a fellow in-
jured laborer for the purpose of playing the part of a man
who had been seriously wronged and thereby induce defendant
to trust and confide in him for the purpose of arousing in de-
fendant the feeling of revenge.   We repeat here what was
set out in *Topolewski v. State,* 130 Wis. 244, 109 N. W.
1037:

"A contemplated crime may never be developed into a con-
summated act.   To stimulate unlawful intentions for the pur-
pose and with the motive of bringing them to maturity so the

consequent crime may be punished, is a dangerous practice. It is safer law and sounder morals to hold, where one arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act by one acting in concert with such owner, that no crime is thus committed. The owner and his agent may wait passively for the would-be criminal to perpetrate the offense, and each and every part of it, for himself, but they must not aid, encourage, or solicit him that they may seek to punish."

The statement in *State v. Currie*, 13 N. Dak. 655, 102 N. W. 875, is a just rule to govern persons engaged in such transactions:

"The authorities almost unanimously hold that a detective may aid in the commission of an offense in conjunction with a criminal, and that the fact will not exonerate the guilty party. Mere deception by the detective will not shield the defendant, if the offense be committed by him free from the influence or instigation of the detective. The detective must not prompt or urge or lead in the commission of the offense."

This rule is approved in the adjudications of different courts as a proper one in the administration of the criminal law. The question was a proper one for the consideration of the jury under the evidentiary facts and circumstances adduced on the trial and the court's attention was directed thereto by the defendant's requested instruction. True the court informed the jury that they must be satisfied affirmatively that defendant intended to and did the acts required under the instructions given to constitute guilt, but the jury were not informed that if the detectives prompted, urged, or originated the perpetration of these offenses, or that they intimidated the defendant and thereby became the active parties to instigate and perpetrate the offense charged, and that defendant under the facts and circumstances of the case was only a passive participant in the crime charged, then he was not guilty. We find enough in the evidence of the case to warrant such an

inference and that question should have been affirmatively submitted to the jury for their consideration in deliberating on their verdict.   We are persuaded that justice has not been done in the case in view of these errors and upon a full consideration of all the facts and circumstances adduced in evidence.

"As has been previously said by this court, the prisoner has the right not only to the solemn judgment of the trial court on the question whether his guilt was sufficiently proven, but upon writ of error he has the right to demand the deliberate opinion and judgment of this court upon the same question." *Gerke v. State,* 151 Wis. 495, 139 N. W. 404.

*By the Court.*—The judgment of the circuit court is reversed, and the action remanded for a new trial.   The warden of the state prison will deliver the plaintiff in error into the custody of the sheriff of Kenosha county, who will hold him in custody to await the further order of the court.

The following opinion was filed April 7, 1915:

BARNES, J. (*dissenting*).   The conduct of the private detectives who figure in this case was reprehensible in the highest degree, and I would have been as well satisfied if the jury could have conscientiously seen its way clear to return a verdict of acquittal.   The instant case is not unique in this respect, however.   The court permitted a judgment of conviction to stand in the *Novkovic Case* (149 Wis. 665, 135 N. W. 465) on confused evidence, on the theory that the trial court and jury might have understood the oral testimony, although we could not figure out what it meant when reduced to writing.   My own idea was that Quinn was not guilty of an assault with intent to commit rape (*Quinn v. State,* 153 Wis. 573, 142 N. W. 510), and that McLain was not guilty of rape (*McLain v. State,* 159 Wis. 204, 149 N. W. 771). It was and is difficult for me to believe that a frail woman

weighing 110 pounds could choke to death a man weighing 145 pounds who was only thirty-nine years of age and accustomed to hard labor.  *Musso v. State, ante,* p. 161, 151 N. W. 327.   In each of the three cases last mentioned judgments of conviction were permitted to stand because there was some evidence to support the verdict returned.   The decisions of the court in these cases were I think correct.   As a trier of fact a jury is the judge of the credibility and weight of evidence, and the integrity of our jury system can best be preserved by following the rules observed by the court in recent years in disposing of appeals in both civil and criminal cases. Where a jury is the trier of fact, the responsibility for the correctness of the conclusion reached should rest with it.   It is only where there is an absence of credible evidence to support a conclusion reached that a court should interfere.

It has never been the rule that, where two persons were engaged in the commission of a crime, consent gave immunity from prosecution, although no person aside from the immediate principals suffered special injury.   Two persons voluntarily engaging in a fist fight or a duel can be prosecuted.   So can those who commit the crime of fornication, adultery, or abortion, as well as other crimes which might be mentioned.

Furthermore, the fact that the party against whom a crime is contemplated suggests, aids, encourages, or abets the commission of the offense or sets a trap for the accused is not a defense where the accused has done every act essential to the completion of the offense.   This is decided in *Topolewski v. State,* 130 Wis. 244, 109 N. W. 1037, and the decision is in harmony with many other authorities on the point.   1 Bishop, Crim. Law (7th ed.) § 262; 1 McClain, Crim. Law, § 118; *People v. Liphardt,* 105 Mich. 80, 62 N. W. 1022; *Davis v. State,* 70 Tex. Crim. 524, 158 S. W. 288, and cases cited; *People v. Bock,* 125 N. Y. Supp. 301; *Thompson v. State* (18 Ind. 386) 81 Am. Dec. 364 and note on p. 366.

It is far from certain that the defendant in this case is the

victim of a "frame-up," or even a subject for very much sympathy. His letter of July 9th was admittedly his own composition, written without suggestion or advice from any one. The woman who translated it into English for him cautioned him against sending it. The jury might well conclude and probably did conclude that the defendant's explanation of his purpose in writing it was absurd in the highest degree. If the concluding paragraph did not mean that the writer would destroy the property of the Jeffery Company or murder Mr. Jeffery unless his demands were acceded to, it did not mean anything. It was not put forth in haste or anger, but with calmness and deliberation. Defendant may not have intended to carry out the sinister threat made, and then again he may. The paragraph referred to reads as follows:

"Now, Mr. Jeffery, I will wait three days for your answer. After that I will not wait any longer, then you see what a poor man can do in short time. Then I am going to play with all that plays with me now. You will lose your millions just as I lost my ribs. Hoping to get satisfactory answer, I will remain yours truly."

It is probable that dynamite outrages may at times be the result of "frame-ups," but surely not always. The only defense available, however, to one who is caught red-handed in the act is that he is the innocent victim of a "frame-up."

I do not consider it very material whether the suggestion to use dynamite came from the detectives or the defendant, but there was ample evidence to warrant the jury in finding that the dynamite idea was the defendant's own conception. The evidence of the detectives was to that effect. It was not very reliable, to be sure, but neither was that of the defendant.

Now, there was no dispute about the following facts: Defendant went from Kenosha to Racine to buy dynamite, and he did buy it and carried it back to Kenosha with him. There is no doubt that he had agreed with the detectives that this dynamite was to be used to blow up DeCou's house, and there

is not the remotest doubt that he intended it was to be so used, unless he was acting under duress. If he was not so acting, then he had done everything essential to constitute a crime under sec. 4398a, Stats. Not a single element or ingredient necessary to constitute an offense was lacking. The jury must have found that he did not act under duress, and it was fully justified in so finding. Aside from the evidence of the detectives, the admitted facts show pretty conclusively that he was not. He had ample time to advise Jeffery or DeCou of what was going on while the plot was being hatched up. He could have notified them personally or by telephone or by letter, or he could request some of his friends to do so if he desired. He passed policemen and a police station in Kenosha when going for the dynamite, and passed policemen in Racine before and after he purchased it, and again in Kenosha after he returned with it. If he was acting under duress he must have been hypnotized. Really a jury would have to be pretty credulous to take much stock in the defendant's claim that he acted under duress while he was plotting murder and doing his part to carry out the plot. If the *Topolewski Case* correctly states the law, the overwhelming weight of the evidence supports the verdict of the jury.

I am not disposed to find fault with the construction placed upon sec. 4398a, Stats., although it is pretty strict. The moral turpitude of the defendant was just as great as though the detectives in fact intended to blow up DeCou's house. There may be room for saying that the jury intended to find the defendant guilty of the offense named in the last part of the statute, to wit, that of conveying the explosive knowing that it was intended to be used by some other person. What I contend is that there is absolutely no room for saying that the jury did not intend to convict for the offense of transporting dynamite with the intention that the same should be used to blow up DeCou. Stripped of verbiage, immaterial for the

purposes of the case, the statute provides that "any person who shall . . . transport . . . dynamite . . . with intent that the same shall be used . . . for the . . . destruction of . . . property or the . . . murder . . . of any person . . . or knowing that such explosive compounds are intended to be used by any other person . . . for any such purpose shall be punished," etc.

Either defendant in transporting the dynamite acted under duress or he did not. If he did, then he could not be convicted under either provision of the statute, and the jury was so informed. If he was not carrying it under duress, what was he carrying it for? The question admits of but one answer. He was carrying it with the intention and expectation that it was going to be used by his supposed confederates in blowing up DeCou's house. He was mistaken in the latter supposition and therefore not guilty of the second offense, but every element of the first offense was present. If the dynamite was really intended by the defendant's supposed pals for the purpose that defendant thought it was, there was no possible way in which the defendant could be guilty of the second offense and not the first. Juries usually exhibit a high degree of common sense, and if the jurors found in this case that the dynamite was transported knowing that it was to be used by some third person for a forbidden purpose, it likewise found that the defendant carried it intending that it should be used for such purpose. This court has in the last few years said with frequent reiteration that it would not reverse judgments in criminal cases for immaterial errors. It must be satisfied that it is reasonably probable that had the error not occurred the result would have been different. *Oborn v. State,* 143 Wis. 249, 126 N. W. 737; *Parb v. State,* 143 Wis. 561, 128 N. W. 65; *Radej v. State,* 152 Wis. 503, 515, 140 N. W. 21; *Miller v. State,* 139 Wis. 57, 119 N. W. 850; *Anderson v. State,* 133 Wis. 601, 114 N. W. 112. To my way

of thinking there is not the slightest ground for believing that the verdict would have been different had the court informed the jury that the defendant could not be convicted under the second provision of the statute. I think, under the well established rules referred to, the judgment should be affirmed.