BRUNO, Plaintiff in error, vs. THE STATE, Defendant
in error.

*April 10—May 4, 1920.*

*Arson: Sufficiency of evidence to support conviction: Criminal
law: Degree of proof required.*

1. Where the only evidence supporting a verdict convicting the
   defendant of arson was the testimony of two witnesses to the
   effect that they had heard him threaten to burn the prop-
   erty, and testimony concerning the apparent identification o.
   defendant's rubber boots with certain plaster casts of foot-
   prints discovered near the burned buildings, and where the
   witnesses who testified as to threats were manifestly actuate
   by animosity towards the defendant, and there was no proof
   that the foot-prints were made at or about the time of t .
   fire. the conviction will be set aside.
2. A conviction of a penal offense cannot be sustained unless the
   testimony as to the guilt of defendant meets the rigid test
   of satisfying beyond a reasonable doubt, mere suspicion of
   his guilt not being sufficient.

ERROR to review a judgment of the circuit court for Clark
county: E. C. HIGBEE, Judge. *Reversed.*

The defendant was charged with the crime of arson in
having burned in the nighttime of August 25, 1919, the barn
and other buildings belonging to one Joseph Hickman. He
was found guilty by a jury and sentenced to imprisonment
for ten years in the state prison. To review such judgment
he prosecutes this writ of error.

*Andrew Gilbertson* of Milwaukee, for the plaintiff in
error.

For the defendant in error there was a brief by the *Attor-
ney General* and *J. F. Baker,* assistant attorney general, and
oral argument by *Mr. Baker* and *Mr. F. A. Jackson,* district
attorney of Clark county.

ESCHWEILER, J. The only question raised by plaintiff
in error is that the evidence is insufficient to support the ver-
dict of guilty and the judgment of conviction.

The defendant in error, about thirty-three years old, unmarried, lived with his father, Leander Bruno, and his mother in the farm house of the father about half a mile distant from the farm house owned by one Joseph Hickman and in a southeasterly direction therefrom. The Hickman house was a short distance south of an east-and-west highway. Southeast of the house was a granary with a garage at one end. Seven or eight feet to the east of the end of the granary was a large barn. Directly south of the barn was a small strip of land in which were planted seven or eight rows of potatoes. About 100 feet south of the barn was a small fenced cornfield. South and partly to the east of the Hickman property was a forty-acre piece belonging to defendant's father. South and partly to the west was a forty-acre piece belonging to one Lockbaum. The map offered in evidence as to these premises and in the record before us was not drawn to scale, and it is impossible either with that or from the testimony in the record to give the respective differences in space between the various locations with accuracy.

The fire, evidently of an incendiary nature from the manner of its burning and the odor of kerosene detected by those who first reached it, was discovered shortly after midnight by Mrs. Hickman. The fire was then burning well up on the side of the granary next to the barn and from there it spread to the barn, which was substantially destroyed.

The following situation is disclosed as existing between the Bruno and the Hickman families:

In October, 1916, a so-called charivari was held in front of the home of defendant's father; the occasion of such party appearing to be that it was claimed by the participants that Hazel, the foster-daughter of defendant's father, was just married to one William Karpinski, both of whom were at the house on this occasion. One of the Hickman boys was shot at that time by Leander Bruno, the father. He was convicted for that offense and brought his case to this

court for review.    *Bruno v. State*, 165 Wis. 377, 162 N. W.
167.    Subsequently his sentence appears to have been com-
muted by the governor in June, 1917, to thirty days in the
county jail.    In August, 1917, on the public highway, the
two Hickman boys and Casimir Karpinski, brother of the
above mentioned William Karpinski, with others, violently
assaulted the defendant.    At about the same time an
estrangement arose and continued during this trial between
the foster-daughter with her husband and the Brunos.

After such assault the defendant caused a criminal prose-
cution to be instituted against the Hickman boys, Casimir
Karpinski, and others, in which action the defendants were
convicted of such assault and battery.    Thereupon the de-
fendant here brought a civil action against the same parties
for the injuries received at that time, and they in turn
counterclaimed for damages against him on account of the
transaction at the charivari party in October, 1916.    This
civil action was tried the day following the verdict in this
case, and the jury found for the plaintiff there, defendant
here, and assessed nominal damages only.

The only evidence which can be considered or is urged
here as supporting the verdict is based upon the testimony
of defendant's foster-sister, Hazel Karpinski, and that of
her husband, William Karpinski, and testimony concerning
the apparent identification of defendant's rubber boots with
certain foot-marks discovered the day following the fire in
the cornfield south of the Hickman barn and in the woods
still further south.

Hazel Karpinski testified in substance on the trial that
after the charivari party of October, 1916, and again after
the assault committed on defendant in August, 1917, the
defendant *Bruno,* referring to the Hickmans and Karpin-
skis, said that he would "burn them up or blow them up or
something," and that old man Hickman was just as bad as
the boys if not worse.

On cross-examination she admitted that on the prelimi-

nary examination in this matter she had in at least three instances lied in her testimony, in that at the preliminary she had falsely testified that she had not heard the Brunos say they would do anything to Joe Hickman (owner of the burned barn) or to his property, and that the defendant did not refer, in the statements he had made, to said Joseph Hickman; and further this statement: "I didn't hear them say they would do anything against the old Hickman, they had it in for the boys."

On redirect examination she testified that she answered that way at the preliminary because she did not dare to make any other answer because the two Brunos sat there and she was then and still is afraid of defendant.

William Karpinski, her husband, testified on the trial that he heard the defendant say, referring to Joseph Hickman, that "if the law didn't even I will even it up; I will take the law myself," and the further statement that defendant would "poison the stock, and if he didn't poison the stock to burn them up or blow them up." On the preliminary examination, in answer to the question as to whether he heard defendant say how he was going to get even with the Hickmans, this same witness answered: "He didn't say how, but he said they were going to get even some way."

At the close of the testimony the defendant moved for his discharge on the ground that the testimony was insufficient. The court in overruling the motion said: "Well, it isn't strong, of course; it is a very weak case." After the verdict of the jury the defendant moved to set aside the verdict and grant a new trial. In disposing of these motions the court said in substance:

"Well, there are a number of things in respect to this case that were not entirely satisfactory to the mind of the court, and I might mention them."

He then recites the facts concerning the awakening of Mrs. Hickman, the first to discover the fire, by the passage of an automobile along the highway in front of their home,

and the fact that no investigation was made by the public authorities in respect to that automobile. That it was evident that suspicion pointed to the defendant because of the animosity that existed between the Bruno family and the Hickmans. He recited the facts above stated as to the prior relationship of the two families and the estrangement between the foster-daughter with her husband and the Brunos and that there was bad blood between the Bruno and Hickman families. In commenting upon the testimony of the foster-daughter, Hazel, and her husband, William Karpinski, he said:

"I have in my own mind a great deal of hesitancy in believing that testimony. The other case I have just listened to as to what occurred on the 1st day of August, 1917, leads me to think and feel that the testimony of Hazel and her husband is very unsatisfactory. They seem to be actuated by a feeling of animosity, and in these two cases that have been tried before me I have been so convinced that there has been a great deal of perjury committed in these that I feel some reluctance to credit that testimony. But however I think, that was clearly matter for the jury to consider."

He then stated that the question of the credit to be given to the witnesses and the fact that the fire was undoubtedly through incendiary causes were proper considerations for the jury. And further:

"Now the only way the defendant is connected with that testimony is the foot-prints in the field towards his house through the cornfield. I confess that when the evidence was first offered, in view of the length of time that existed since the field had been cultivated, that I felt some doubt as to whether or not those foot-prints could be as distinct as would be necessary to have them in order to identify them positively."

He refers to the standing, reputation, and undoubted integrity of the witness who made the plaster casts, and said that were it not for that,

"I should have felt very strongly like directing an acquit-

tal." . . . "Now the evidence of these casts is on all-fours with the evidence of finger-prints. While it is true that rubbers of that size and of that make undoubtedly exist in great numbers, it is not one chance in a million probably that any two rubbers worn to the extent that these have been could be found that would show the exact amount of wear, the same amount of wear exactly, so as to leave the lines and imprints precisely the same. It seems that this cast of the track and the bottom of the rubber do show precisely the same wear, the same number of ridges left. If that is so, there is little chance to doubt that the foot-prints were made by a man wearing these rubbers. The rubbers were found in the defendant's room; it was practically conceded they were his rubbers. This evidence all taken together I think justifies, that is it warrants, the finding of guilt in my judgment. I do not think the court ought to undertake to set up his judgment against the judgment of the jury. I want to say, however, that the impression made upon my mind by the deportment and appearance of the defendant was extremely favorable. He told his story with a great deal of frankness and apparent honesty. And it is an unpleasant thing for me to be forced to conclude that he is guilty of such a crime as this, but it is the conclusion that I feel I am forced to take."

The examination of the record in this case convinces us that the trial court was more than warranted in feeling as he did that the record at most made a very weak case against the defendant. He was particularly warranted in what he suggested as quoted above with reference to the testimony of the foster-daughter, Hazel Karpinski, and her husband.

We think also that too much weight and reliance was placed by the trial court upon the evidence as to the finding of foot-marks as of some one walking in the cornfield south of the barn in the general direction between the Bruno home and the Hickman barn.

The cornfield over which the tracks were traced was loose clay which had been cultivated about two months before then and was at the time dry. To warrant a legitimate inference that such foot-marks were made by the defendant

in going to and from the Hickman premises at the time of the fire, it was necessary that it should appear with some degree of reasonable probability that these foot-marks were not more than twenty-four hours old and that they were made by the identical pair of rubbers which had been obtained by one of the witnesses when he and several others, the day following the fire, went to defendant's home, asked for and obtained them. That such impressions were of just the right age, and no more, to meet the exigencies of the situation, was, as we view the testimony in the record, too clearly speculative to be of substantial weight. The boots themselves and the plaster-cast impressions made of the foot-marks are before us, and from a careful study of them in our judgment they do not so sustain the conclusion, apparently confidently arrived at in the testimony of the witnesses, as to their being an accurate resemblance between the worn surfaces and marks on the rubbers and what is shown by the plaster casts, that we can be justified in feeling that, in connection with the other evidence, it warrants the conclusion, beyond a reasonable doubt, that the defendant, wearing this particular pair of rubbers, went through this cornfield in the direction of the Hickman barn at or about the time of the fire. Without a reasonable inference in that regard there is no support for the verdict.

Much stress was laid by the trial court, as indicated in his quoted statement, as to the standing and reputation of the witness who made the plaster cast of the foot-marks and the comparisons with the rubber boots. It is not here, however, a question of the veracity of the witness that is involved in considering the weight which is to be given to that which is but a conclusion of the witness upon certain physical facts.

There is no suggestion in the record, so far as we can discover, as to how it happened that the one foot-print from which an impression was taken was in the Lockbaum woods and directly south of the Hickman premises and southwest of the defendant's home and therefore not in the line be-

tween the two premises.   This greatly weakens, if not entirely destroys, any inference that might be drawn from the fact that the tracks going through the cornfield were nearly in line with the general direction between defendant's home and the Hickman barn.

Loath as this court has always been and still is to set aside a judgment based upon a verdict of guilty by a jury and which has passed the careful consideration of a trial court, we are nevertheless compelled in a case such as this, involving a crime of such a grave nature and in which the verdict of guilty by the jury was followed by punishment measured by a sentence of ten years' imprisonment in the state prison, to feel the necessity of bearing steadfastly in mind the well established rule of law that no person shall be convicted of a penal offense unless the testimony be such as will sustain the rigid test of satisfying beyond a reasonable doubt.

Our judgment, after a consideration of the entire record, compels us to the conclusion that defendant's guilt was not sufficiently proven, and the verdict therefore cannot be upheld as the result of such a fair and impartial trial as every accused person is entitled to have under the law of this state. *Gerke v. State,* 151 Wis. 495, 139 N. W. 404; *Koscak v. State,* 160 Wis. 255, 269, 152 N. W. 181; *Kuhl v. State,* 167 Wis. 495, 499, 167 N. W. 743.

The testimony in this case, in our judgment, when reasonably and fairly construed, creates no more than a suspicion that the defendant committed this offense.   A suspicion merely is insufficient to support a judgment of conviction. *Lonergan v. State,* 111 Wis. 453, 460, 87 N. W. 455; *State v. Vandewater* (Iowa) 176 N. W. 883.

The evidence being insufficient to warrant a conviction, the defendant must be discharged.

*By the Court.*—Judgment reversed, with directions to discharge the defendant.